MARINE SOLUTION SERVICES, INC.,
an Alaska Corporation, Appellant/
Cross–Appellee,

v.

Thomas HORTON, Appellee/
Cross–Appellant.

Thomas Horton, Appellant,

v.

Steve Adams, Appellee.

Nos. S–9916, S–9935.

Supreme Court of Alaska.

May 16, 2003.

Theodore M. Pease, Jr. and Michael W. Sewright, Burr, Pease & Kurtz, Anchorage, for Appellant/Cross–Appellee Marine Solution Services, Inc.

Charles W. Ray, Jr., Anchorage, for Appellee/Cross–Appellant and Appellant Thomas Horton.

Lanning M. Trueb, Beard Stacey Trueb Jacobsen & Stehle, LLP, Anchorage, for Appellee Steve Adams.

Brewster H. Jamieson and Brad E. Ambarian, Lane Powell Spears Lubersky, LLP, Anchorage, for Intervenor CGL Insurers.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

Thomas Horton suffered compound fractures in both legs while moving a barge from Pickworth Dock in Anchorage. Horton sued Marine Solution Services, the owner of the vessel and the company for which he served as president and chief executive officer, for unseaworthiness under traditional maritime law and for negligence under the Jones Act. A jury returned a verdict for Horton and awarded him $1,184,873.85. Marine Solution Services appeals several of the jury instructions, focusing on whether Horton was an employee and seaman entitled to a remedy under the Jones Act and whether *The Pennsylvania* rule applies. Horton appeals both the reduction of the jury award and the interest on the award.

Although we affirm the majority of the challenged superior court rulings, we conclude that Horton may be entitled to the five percent enhancement of prejudgment interest and that postjudgment interest shall accrue at 10.5 percent. On these two issues, we reverse and remand for a corrected judgment.

## II. FACTS AND PROCEEDINGS

### A. Factual History

Marine Solution Services, Inc. (MSS) is a closely held corporation in the business of commercial diving, marine contracting, marine services, and vessel operations. Thomas Horton is the president, chief executive officer, and general manager of MSS. His mother, Gerda Horton, is the secretary. Gerda Horton is also the majority shareholder of MSS. Together they are the only officers and directors of MSS. Thomas Horton and his mother also own another company together called Horton Marine. Thomas Horton owns fifty-one percent of the stock, while Gerda Horton owns forty-nine percent. They are the only officers and directors of that corporation as well.

In the late afternoon of September 18, 1995, an attorney for Chugach Electric Association telephoned Horton and informed him that Chugach Electric had taken possession of Pickworth Dock. The attorney demanded that Barge 204 be removed from Pickworth Dock or the vessel would be seized. Horton agreed to move the barge at the next high tide, which would be at 3:30 a.m. on the morning of September 19. Horton then made a radio call to Steve Adams, the MSS employee working as skipper of the tug SOLUTION, and told him of the plan to tow the barge from Pickworth Dock at high tide that morning. Horton said that he would be assisting in the operation.

Horton arrived at the dock at approximately 3:00 a.m. and was taken to Barge 204 aboard a skiff. At the front of the barge are two "Panama chocks," which are two large pipes in the shape of an inverted letter "U," welded to the deck. When the barge is being towed, the tow lines generally are run through the Panama chocks so that the lines do not come loose or sweep across the deck as the tug turns. Adams and Gerald Wal-

lace, the engineer on the SOLUTION, secured a tow line to the barge, but did not pass it through the Panama chocks, and the tug SOLUTION began towing Barge 204 away from the dock.

Horton, who was aboard the barge, noticed that the SOLUTION and the barge were headed for the North Star Dock and a barge tied to it. A collision seemed imminent. Horton sprinted to the forward part of the barge in an attempt to signal Adams, who was navigating the SOLUTION, to tow farther offshore to avoid an accident. Adams noticed Horton's actions and also saw that the tug and barge were drifting toward the dock. After the starboard engine died and was restarted, Adams gave the engines full power. This sudden movement in a different direction jerked the towline taut and it snapped across the deck. Horton was standing between the towline and the steel weatherwall, so that when the line swept across the deck it smashed Horton's legs against the weatherwall. Horton suffered compound fractures in all four bones just above the ankles in both legs.

Horton's legs were severely injured and had to be reconstructed. In addition to the fractures, Horton claims associated nerve, vascular, muscle, and skin injuries. Horton apparently still suffers from chronic pain and depression, and now walks with a pronounced limp.

### B. Procedural History

This case originally consisted of two separate lawsuits. Horton filed his complaint against MSS in May 1997. He set forth five causes of action: (1) unseaworthiness; (2) negligence and breach of the duty of care under the Jones Act; (3) maintenance, cure, and unearned wages; (4) failure and refusal to provide adequate medical attention; and (5) negligence under the doctrine of respondeat superior. The first four causes of action were based on the assertion that Horton was a seaman. The fifth cause of action was raised in the event that the trial court determined Horton was not a seaman and there-

fore not entitled to the relief set forth in the first four causes of action. Horton requested maintenance, cure, unearned wages, compensatory damages, attorney's fees and costs, and interest.

In September 1998 Horton filed a second lawsuit against Steve Adams, the MSS employee operating the tug SOLUTION when Horton was injured. Horton asserted only one cause of action, negligence, for failure to ensure a safe towing arrangement, failure to warn, failure to maintain a proper lookout, and a general failure to act reasonably under the circumstances. Horton requested compensatory damages, attorney's fees, costs, and interest. The two lawsuits were consolidated in August 1999.

In August 1999 MSS moved for summary judgment as to Horton's first four causes of action on the grounds that he is not a seaman and therefore not entitled to claims for Jones Act negligence, a warranty of seaworthiness, or maintenance and cure. MSS also moved for summary judgment on Horton's fifth cause of action for common law negligence, arguing that the Alaska Workers' Compensation Act (AWCA) provided Horton's exclusive remedies. Horton moved for partial summary judgment as to the liability of MSS because, Horton alleged, MSS was in violation of at least two statutory requirements when Horton was injured. MSS cross-moved for summary judgment on the issue of liability on the basis that Horton "is president, chief executive officer, general manager, director, and forty nine percent owner of [MSS]," and any negligence of MSS is imputed to Horton. Adams also moved for summary judgment on the ground that Horton is a seaman and therefore not able to bring a claim against a fellow employee,[1] and that even if Horton were not a seaman, his exclusive remedies are under the Longshore and Harbor Workers' Compensation Act.[2] Superior Court Judge Brian C. Shortell denied all motions, except that of Adams, who was granted summary judgment.

---

**1.** *The Osceola*, 189 U.S. 158, 175, 23 S.Ct. 483, 47 L.Ed. 760 (1903); *McAleer v. Smith*, 57 F.3d 109, 116–18 (5th Cir.1995).

**2.** 33 U.S.C. §§ 902–38 (2001).

Trial against MSS began on December 7, 1999. The jury found that Horton was a seaman and therefore able to maintain Jones Act claims. The jury found for Horton on all claims except those related to his diabetes, but concluded that he was fifteen percent at fault. Horton was awarded $186,000 in cure, $175,000 for past damages, and $1,155,000 for future damages. The trial court reduced the amount of cure by the medical bills that MSS had already paid. The trial court also initially increased pre—and postjudgment interest by the statutory five percent enhancement, but then removed the enhancement so that prejudgment interest was set at ten percent,[3] and postjudgment interest was set at 7.545%. Both Horton and MSS appeal.

## III. DISCUSSION

### A. The Marine Solution Services Appeal

#### 1. Horton may sue MSS.

■ MSS first argues that "Horton should not have been allowed to sue his company...." It claims that Horton "was in complete control of MSS, effectively his *alter ego*," and that therefore any negligence is imputed to Horton. It also asserts that "[a]n individual who is owner of a vessel cannot sue himself to recover for any of the tort maritime remedies." MSS moved for summary judgment on this issue, but the trial court denied the motion. We consider the issue de novo and view the facts in the light most favorable to the nonmoving party.[4]

It is uncontested that MSS is an Alaska corporation. As such, it can sue and be sued in its corporate name.[5] Drawing the facts in the light most favorable to Horton, MSS had "significant assets, was insured against losses, employed several individuals, filed corporate tax returns, [and] held itself out as a bona fide corporation...." As a closely held corporation, MSS had only two people on its board of directors: Horton and his mother Gerda. Gerda Horton is the majority shareholder.[6] She controls the election of directors and has the authority to appoint and discharge the president of the corporation. Horton and Gerda also jointly own Horton Marine, Inc.[7] Horton Marine holds title to the tug SOLUTION. The other vessel involved in the accident in this case, Barge 204, was owned by Rasmussen Equipment Company. At the time of the accident, both boats were leased by bareboat charter to MSS; MSS has conceded that it was, at the time of the incident, owner pro hac vice of both vessels. Thus, MSS is an Alaska corporation that was owner of the vessels at the time of the accident.

Because MSS is a corporation and was the owner of the vessels, there is no support for MSS's assertion that an officer may not sue in tort the corporation for which he or she works. Indeed, MSS concedes this point: "[MSS] has not found any case in which the claims of an individual have been denied against a corporation because he was president, chief executive officer, director and a major shareholder...."

■ It is well-established that the corporate entity is distinct "although all or a majority of its stock is owned by a single individual or corporation, or although the corporation is a so-called 'family' or 'close' corporation."[8] This holds equally true in maritime cases. In *Stewart v. Moore,* for example, a federal district court dismissed claims against the sole stockholder and president of the corporation on the basis that the corporate entity was the owner of the vessel

**3.** In accordance with the federal admiralty rule, the jury was permitted to award prejudgment interest, rather than the trial court. *Robinson v. Pocahontas,* 477 F.2d 1048, 1053 (8th Cir.1973). Neither party objected to the trial court submitting this issue to the jury.

**4.** *Christensen v. NCH Corp.,* 956 P.2d 468, 474 (Alaska 1998).

**5.** AS 10.06.010(2).

**6.** MSS claims that Gerda Horton is fifty-one percent owner, and Thomas Horton owns the other forty-nine percent. Gerda Horton admits to being the majority shareholder but does not specify her percentage.

**7.** MSS also claims that Thomas Horton owns fifty-one percent of Horton Marine and Gerda Horton owns forty-nine percent.

**8.** 18 AM.JUR 2D *Corporations* § 45 (2002).

and therefore the proper defendant.[9] In general, the corporate identity will be disregarded only when "the separate personalities of the corporation and the individual no longer exist."[10] Relevant factors for considering whether a corporation is merely an alter ego are commingling of funds and assets, undercapitalization, and failure to observe corporate formalities.[11] Here, Horton is not the majority shareholder, and there has been no evidence that he commingled funds or assets, undercapitalized MSS, or failed to observe the necessary formalities. The corporate entity remains distinct, and there is little evidence to suggest MSS was Horton's alter ego. MSS is a corporation, and it may not disavow its own status when convenient or in order to avoid litigation.[12] The trial court's denial of summary judgment to MSS on this point is affirmed.

### 2. Horton was an employee.

■ In a related argument, MSS claims that Horton was not an employee of MSS and therefore not able to bring Jones Act or unseaworthiness claims. At the conclusion of the trial, the court granted a directed verdict finding that Horton was an employee of MSS and did not submit the issue to the jury. MSS asserts that this constitutes reversible error and that the question whether Horton was an employee should have been submitted to the jury. We affirm a directed verdict

where reasonable jurors could not reach different conclusions.[13]

■ The Jones Act remedy is available only against the seaman's employer.[14] The Jones Act provides that "[a]ny seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law."[15] Thus, it must be determined whether MSS was Horton's employer. While there is no clear test to resolve this question, there are some guiding principles. The United States Supreme Court has concluded that employment should be construed broadly:

> [T]he word "employment" should be construed so as to give protection to seamen for torts committed against them by those standing in the proximate relation of employer, and the rules of private agency should not be rigorously applied. Yet this Court may not disregard the plain and rational meaning of employment and employer to furnish a seaman a cause of action against one completely outside the broadest lines or definitions of employment or employer.[16]

With that in mind, the Supreme Court then set forth three questions: "Whose orders controlled the master and crew? Whose money paid their wages? Who hired the crew?"[17] Thus, the employer is the entity that supervises, manages, directs, and controls the employee.[18] Ordinarily this is a

---

**9.** 334 F.Supp. 396, 397 (S.D.Tex.1971); *see also* Kathleen M. Dorr, *Who Is "Owner" of Vessel or "Employer" of Seaman for Maritime Purposes,* 95 A.L.R. Fed. 636 § 6 (1989).

**10.** 18 Am.Jur.2d *Corporations* § 45 (2002). This applies in contract and in tort. *Minton v. Cavaney,* 56 Cal.2d 576, 15 Cal.Rptr. 641, 364 P.2d 473, 477 (1961).

**11.** *Uchitel Co. v. Telephone Co.,* 646 P.2d 229, 235 (Alaska 1982); *Lorenz v. Beltio, Ltd.,* 114 Nev. 795, 963 P.2d 488, 497 (1998).

**12.** *See Croxton v. Crowley Maritime Corp.,* 817 P.2d 460, 464 (Alaska 1991) (noting that "persons who choose to become incorporated may not evade the consequences of corporateness when that would suit their convenience") (citation omitted).

**13.** *D.P. v. Wrangell Gen. Hosp.,* 5 P.3d 225, 228 (Alaska 2000).

**14.** *Cosmopolitan Shipping Co. v. McAllister,* 337 U.S. 783, 787 n. 6, 69 S.Ct. 1317, 93 L.Ed. 1692 (1949); *see also Evans v. United Arab Shipping Co. S.A.G.; M/V Al Wattyah,* 4 F.3d 207, 215 (3d Cir.1993); *Addison v. Gulf Coast Contracting Servs., Inc.,* 744 F.2d 494, 498 (5th Cir.1984).

**15.** 46 U.S.C. app. § 688(a) (2003).

**16.** *Cosmopolitan Shipping,* 337 U.S. at 790–91, 69 S.Ct. 1317. *See also Evans,* 4 F.3d at 216 (applying traditional rules of agency in addition to following reasoning of *Cosmopolitan Shipping).*

**17.** *Cosmopolitan Shipping,* 337 U.S. at 795, 69 S.Ct. 1317.

**18.** *Addison,* 744 F.2d at 499.

jury question.[19]

MSS was owner pro hac vice of the vessels, and Horton was aboard one of the vessels attempting to prevent its seizure when he was injured. There is no indication that Horton was working on his own behalf. The record also reveals that Horton was serving as "acting deck hand" at the time, according to Captain Adams, and that "technically" Horton was Adams's subordinate. In general, the captain is "in charge of the vessel and operations" even when Horton is on board. Adams had been hired by Steve Miller, the port captain for MSS, and only met Horton briefly two days before the accident. In addition, Horton was, broadly speaking, under the control of MSS since it had the authority to discharge him. Gerda Horton testified that she considered Horton to be an employee of the corporation since he did everything that was necessary and served in any capacity in which he was needed. In this context, Horton could have been nothing other than an employee of MSS. Because MSS submitted no evidence that could have allowed reasonable jurors to conclude that Horton was not an employee, we affirm the directed verdict as to Horton's employee status.

### 3. The denial of summary judgment and the jury instruction on seaman status were not erroneous.

In addition to being an employee, Horton must establish seaman status at the time of injury to maintain his Jones Act, unseaworthiness, and maintenance and cure claims. His status is therefore critical to most of the claims in this case. Yet the Jones Act does not define "seaman." Instead, the definition of "seaman" has been delineated in case law. In general, a seaman must have an "employment-related connection to a vessel in navigation" and "contribute to the function of the vessel or to the accomplishment of its mission."[20] The United States Supreme Court has clarified that "employment-related connection to a vessel in navigation" means a connection "that is substantial in terms of both duration and nature."[21] The Court added that the inquiry into who is a seaman "is of necessity fact specific; it will depend on the nature of the vessel and the employee's precise relation to it."[22] We recognized these guidelines in *Cavin v. State, Department of Public Safety*.[23]

MSS raises two arguments on Horton's seaman status: (1) the trial court erred in denying its motion for summary judgment on seaman status, and (2) the trial court improperly instructed the jury on seaman status. We review the denial of summary judgment de novo.[24] Whether a jury instruction incorrectly states the law is a legal question to which we apply our independent judgment.[25] An erroneous statement of law in a jury instruction will not constitute reversible error unless it prejudiced one of the parties.[26]

With respect to MSS's first claim that the trial court erred by not granting summary judgment, seaman status is generally a jury question.[27] As we confirmed in *Cavin*, the determination of seaman status is necessarily fact-specific.[28] Moreover, the

---

**19.** Kathleen M. Dorr, *Who Is "Owner" of Vessel or "Employer" of Seaman for Maritime Purposes*, 95 A.L.R. FED. 636 § 2(b) (1989).

**20.** *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 355, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991) (citations omitted).

**21.** *Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 & 370, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995).

**22.** *Id.* at 371, 115 S.Ct. 2172 (quoting *Wilander*, 498 U.S. at 356, 111 S.Ct. 807).

**23.** 3 P.3d 323, 327–28 (Alaska 2000).

**24.** *Christensen v. NCH Corp.*, 956 P.2d 468, 474 (Alaska 1998).

**25.** *Power Constructors, Inc. v. Taylor & Hintze*, 960 P.2d 20, 29 (Alaska 1998).

**26.** *Id.; Grimes v. Haslett*, 641 P.2d 813, 818 (Alaska 1982).

**27.** *Wilander*, 498 U.S. at 356, 111 S.Ct. 807 ("If reasonable persons, applying the proper legal standard, could differ as to whether the employee was a 'member of a crew,' it is a question for the jury.").

**28.** *Cavin*, 3 P.3d at 327 n. 23 (quoting *Wilander*, 498 U.S. at 356, 111 S.Ct. 807).

standard set by the Supreme Court for summary judgment as to seaman status is quite high: "[W]here undisputed facts reveal that a maritime worker has a clearly inadequate temporal connection to vessels in navigation, the court may take the question from the jury by granting summary judgment or a directed verdict." [29] While Horton's role at MSS was at times more office-related, undisputed facts do not show a "clearly inadequate temporal connection." According to affidavits and deposition testimony filed by Horton in opposition to MSS's motion for summary judgment, Horton had served on vessels for several months at a time. He also regularly serviced these vessels. He tended to fill in and serve as crewman or assistant deck hand whenever the need arose. MSS counters that "it had been conclusively shown Horton spent at most 10% of his time at sea" and certainly less than the thirty percent "necessary to qualify as a seaman under *Chandris.*"

We do not agree. First, in *Chandris* the Court explicitly stated that thirty percent was "no more than a guideline" and that "departure from it will certainly be justified in appropriate cases." [30] Second, MSS's assertion that it "conclusively" proved that Horton spent no more than ten percent of his time at sea is flawed because it relies entirely upon the vessel logs. This evidence was contradicted by affidavits and deposition testimony from three witnesses. It was not error for the trial court to deny the motion for summary judgment. Similarly, it was not error for the trial court to have declined to grant MSS a directed verdict on this issue at the conclusion of the trial. Horton, his son Thomas, Jr., and Captain Miller provided additional testimony at trial on the extent of Horton's service aboard the vessels. This further refuted MSS's contentions and created a disputed question of fact appropriate for the jury to decide.

■ MSS also asserts that the trial court improperly instructed the jury on seaman status. MSS takes issue with the trial court's Instruction No. 15, which was based

upon the *Wilander* and *Chandris* holdings, but does not mention the thirty percent guideline:

Mr. Horton was permanently assigned to Marine Solution Services, Inc.'s fleet if he had more than a temporary or occasional connection with its vessels, and proves that he had an actual regular connection with those vessels.

If you find that Mr. Horton was not permanently assigned to a fleet of vessels, as I have just defined it, he nevertheless can satisfy the first part of the test for seaman status if he performed a substantial part of his work on the fleet of vessels, that is if he performed a significant part of his work on the fleet of vessels with at least some degree of regularity and continuity, and his duties on the vessels were more than merely fortuitous and incidental.

Horton responds that the trial court followed the Fifth Circuit pattern jury instruction, which does not include a reference to the thirty percent guideline even though that is the circuit in which the guideline originated.

We have previously acknowledged that the thirty percent reference is no more than a guideline:

As a general guide to this inquiry, the *Chandris* Court stated, "we think it preferable to focus upon the essence of what it means to be a seaman and to eschew the temptation to create detailed tests to effectuate the congressional purpose, tests that tend to become ends in and of themselves." Nevertheless, the Court approved as "an appropriate rule of thumb for the ordinary case" the "30 percent" test developed in the Fifth Circuit and followed by many courts. But it warned that this benchmark should "serve[ ] as no more than a guideline ... and departure from it will certainly be justified in appropriate cases." [31]

Because the thirty percent guideline was consciously designed as a flexible rule, failure to include it does not render the instruction erroneous. While it might be helpful for

**29.** *Chandris, Inc. v. Latsis,* 515 U.S. 347, 371, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995).

**30.** *Id.; see also Cavin,* 3 P.3d at 328.

**31.** *Cavin,* 3 P.3d at 328 (quoting *Chandris,* 515 U.S. at 369, 371, 115 S.Ct. 2172).

trial courts to mention the thirty percent guideline as guidance for the jurors, the jury instruction in this case nevertheless presents a correct test for seaman status.

▮▮▮▮▮ MSS also contends that the trial court's use of the phrases "more than a temporary or occasional connection" and "more than merely fortuitous and incidental" are incorrect and warrant reversal and a new trial because a jury could interpret these phrases as meaning that a litigant is a seaman if he spent little time at sea. However, these phrases do not exist in isolation and are modified in the instruction by the terms "substantial part of his work," "significant part of his work," and "some degree of regularity and continuity." No reasonable juror could find that Horton spent only a minimal amount of time on vessels but also performed a "substantial part of his work" on vessels "with some regularity." When the jury instruction is read in its entirety, MSS's suggested interpretation is inaccurate. We conclude that there is no error in the jury instruction.[32]

### 4. The trial court did not improperly reverse its earlier position on *The Pennsylvania* Rule and prejudice MSS.

▮▮▮ MSS argues that the trial court initially declined to apply *The Pennsylvania* Rule to this case but, at the last moment, reversed its position and decided that the jury should be charged on the Rule.[33] MSS contends that this purported shift in position prejudiced its case and that it would have tried the case differently if it had known the Rule was going to apply. Specifically, MSS points to statements by Judge Shortell on December 22, 1999, during the discussion of proposed jury instructions. "[T]he facts of this case ... may make *The Pennsylvania*

Rule applicable. I had rejected that idea but the more-when I read these cases, I think that's a close call...." Judge Shortell then added, "I know that this is a reversal of a position I have taken and I want to give you every opportunity to respond." Judge Shortell ultimately ruled that the Rule did apply and so instructed the jury.

MSS's claim that it was prejudiced by the reversal of position is unconvincing for two reasons. First, there is no way it could have known that Judge Shortell originally had reservations about the application of the Rule to this case because he never communicated his thoughts to the parties. In August 1999 Horton filed a motion for partial summary judgment as to liability. That motion asserted that the Rule should apply and that, since MSS's expert allegedly conceded that MSS could not show that the violations did not cause Horton's injuries, Horton "is entitled to an order finding that defendant Marine Solution Services, Inc., is liable to him as a matter of law." The trial court denied the motion without explanation and without mentioning *The Pennsylvania* Rule. Whether Judge Shortell reversed his thinking on this legal issue is immaterial. What is critical is that he never communicated his position to the parties, much less issued a legal ruling on the matter.

Second, we are not persuaded by MSS's argument that it would have handled the case differently had it known that the trial court was contemplating applying the Rule. Both parties called witnesses who testified to the regulations and whether they had been violated when Horton was injured; this testimony would only be relevant to establishing whether *The Pennsylvania* Rule applied. Thus, the record does not support the notion that the trial court changed course to the detriment of MSS.

**32.** We note that even if Horton had not qualified as a seaman under the federal tests, he would have qualified as a *Sieracki* seaman for purposes of an unseaworthiness remedy because the injury occurred at sea. *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 95, 66 S.Ct. 872, 90 L.Ed. 1099 (1946); *Cavin*, 3 P.3d at 331–32 (holding that 1972 amendments to Longshore and Harbor Workers' Compensation Act only superseded *Sieracki* as it applied to longshoremen, and that

other maritime workers still have unseaworthiness claims under *Sieracki* ).

**33.** *The Pennsylvania* Rule provides that if a vessel is in violation of a statutory duty intended to prevent collisions at the time of an accident, the burden of proof shifts to that vessel to show that the violation could not have been the cause of the collision. *The Pennsylvania*, 19 Wall. 125, 86 U.S. 125, 136, 22 L.Ed. 148 (1873).

### 5. The trial court did not err in applying *The Pennsylvania* Rule.

MSS next contends that *The Pennsylvania* Rule was erroneously applied to this case. It first alleges that the Rule has been "roundly criticized and disfavored." It then suggests that the Rule generally only applies to collisions and not to Jones Act claims such as Horton's. MSS notes that the effect of the Rule is to shift dramatically the burden of proof from Horton to MSS. Horton counters that the Ninth Circuit has applied the Rule to maritime actions that did not involve collisions. Whether the Rule applies to this case presents a question of law, to which we apply our independent judgment.[34]

*The Pennsylvania* Rule provides that if a vessel is in violation of a statutory duty[35] intended to prevent collisions at the time of the accident, the burden shifts to that vessel to prove that its conduct did not and could not have been the cause:

> [W]hen, as in this case, a ship at the time of collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could

not have been. Such a rule is necessary to enforce obedience to the mandate of the statute.[36]

The Rule allocates the burden of proof to the party in violation of the statute or regulation.[37] In effect, it is an evidentiary rule that reverses the burden of proof.[38] And although it imposes a heavy burden—that the violation could not have been a cause of the accident—it does not determine a party's share of liability.[39] Therefore, the Rule has survived the United States Supreme Court's adoption of a comparative fault scheme for admiralty matters.[40] Here, the trial court employed the Rule in jury Instruction Nos. 24 and 25, which both state that if MSS "failed to show that the violation *could not have been one of the causes* of the injuries to Mr. Horton, you must find that [MSS] is liable to compensate Mr. Horton for his injuries." (Emphasis added.)

MSS argues that the Rule does not apply to personal injury or Jones Act cases. We disagree. Although the Rule arose in a case that involved a vessel collision, it has been extended to non-collision cases. For example, the Ninth Circuit, which has frequently employed the Rule,[41] has applied the Rule in Jones Act personal injury cases. In *Mathes v. The Clipper Fleet*, a seaman was injured while transferring cargo between two ships.[42] He brought a Jones Act claim and

**34.** *Langdon v. Champion*, 752 P.2d 999, 1001 (Alaska 1988) (citation omitted).

**35.** Whether MSS violated any statutory duties that would have triggered the Rule is discussed below.

**36.** *The Pennsylvania*, 86 U.S. at 136.

**37.** *Pennzoil Producing Co. v. Offshore Express*, 943 F.2d 1465, 1472 (5th Cir.1991).

**38.** *Candies Towing Co. v. M/V B & C Eserman*, 673 F.2d 91, 93 (5th Cir.1982). In a related argument, MSS claims that the language of the Rule implies to the jury that MSS must show beyond a reasonable doubt that it could not have caused the accident, and the jury instructions should have provided instead that "[t]he defendant has the burden of showing by clear and convincing evidence that [the violation] was not a cause of the accident." However, the jury instructions made no reference to "beyond a reasonable doubt" and instead included a general instruction specifying that the burden was the

standard civil "more likely than not" burden. There is no error.

**39.** *Pennzoil*, 943 F.2d at 1472.

**40.** *Id.* MSS contends that the Supreme Court's decision in *Reliable Transfer* may have effectively overruled *The Pennsylvania* Rule. *See generally United States. v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). This is not correct. It is widely recognized that *Reliable Transfer* only overruled *The Pennsylvania* on the point of allocating comparative fault. *United States v. Nassau Marine Corp.*, 778 F.2d 1111, 1116 (5th Cir.1985); *Allied Chem. Corp. v. Hess Tankship Co. of Delaware*, 661 F.2d 1044, 1052 (5th Cir.1981).

**41.** *Mathes v. The Clipper Fleet*, 774 F.2d 980, 982 (9th Cir.1985) (citing five additional cases in which Ninth Circuit employed the Rule).

**42.** *Id.* at 981–82.

argued that the Rule should apply because the captain did not have his credentials physically aboard the ship as required by Coast Guard regulations.[43] The court concluded that the Rule did not come into play "because there is no conceivable connection between the violation and the injury."[44] In other words, the court assumed the Rule applied in the Jones Act case but then concluded that there was no nexus between the violation and the injury. Other circuits have been more emphatic that the Rule applies in non-collision cases. In *United States v. Nassau Marine Corp.,* the Fifth Circuit explicitly stated that "[t]he [*Pennsylvania*] Rule does not apply only to collisions."[45] The Fifth Circuit later explained that "the rule has been reformulated to apply to any 'statutory violator' who is a 'party to a maritime accident.' "[46] We adopt the majority position set forth by the Ninth Circuit in *Mathes* that the Rule applies if there is a nexus between the violation and the injury. The trial court's application of the Rule here was not erroneous.

### 6. The jury instructions concerning violations of the two regulations were not erroneous.

Having concluded that *The Pennsylvania* Rule does apply in this case, we will now examine both regulations that Horton claims MSS violated. The first is a Coast Guard regulation governing uninspected towing vessels:

An individual of 21 years or more of age holding a license as master of inspected,

self-propelled vessels, or a license as mate or a pilot of inspected, self-propelled vessels of more than 200 gross tons, is authorized to serve as operator of uninspected towing vessels *within any restrictions on the individual's license.*[47]

(Emphasis added.) Because Captain Adams was licensed only to serve as master of vessels of not more than 100 gross tons and the tug SOLUTION was a vessel of 123 gross tons, the trial court ruled that MSS violated the regulation as a matter of law.[48] MSS contends that the trial court should have submitted the question to the jury and that the trial court should have considered whether there was an exception to the Coast Guard regulation for vessels engaged in the offshore mineral and oil industry. We review grants of summary judgment de novo.[49] Whether a jury instruction presents the correct law is a legal question to which we apply our independent judgment.[50] An erroneous statement of law in a jury instruction will not constitute reversible error unless it has prejudiced one of the parties.[51]

■ There is little merit to MSS's argument. MSS has conceded the pertinent facts: Captain Adams, who was master of the tug SOLUTION when Horton was injured, was licensed to operate vessels up to 100 gross tons while the tug SOLUTION was a vessel of 123 gross tons. Those were the only facts necessary to determine whether the captain was operating the vessel "within any restrictions on the individual's license." MSS's contention on appeal that the trial

**43.** *Id.* at 982–83.

**44.** *Id.* at 983.

**45.** 778 F.2d at 1116.

**46.** *Pennzoil Producing Co. v. Offshore Express, Inc.,* 943 F.2d 1465, 1472 (5th Cir.1991). *But see Wilkins v. Am. Export Isbrandtsen Lines, Inc.,* 446 F.2d 480, 486 (2d Cir.1971) ("Finally, as a judgmental matter, we are not persuaded that there are broad considerations of policy which require that we extend the admiralty rule of *The Pennsylvania* beyond the chosen area of ship collisions to embrace Jones Act cases.").

**47.** 46 C.F.R. § 15.910(a) (1989) (amended Nov. 20, 2000).

**48.** This ruling of a violation triggered *The Pennsylvania* Rule and resulted in a jury instruction

that MSS had to show the violation "could not have caused" Horton's injuries. Courts in the Ninth Circuit have held that violation of a regulation enacted for personnel safety triggers the Rule. *Elms v. Crowley Marine Service,* 1997 A.M.C. 835, 842–43 (W.D.Wash.1996). The license requirement is mandatory and was enacted to establish "the complement necessary for safe operation of vessels." 46 C.F.R. § 15.101.

**49.** *Christensen v. NCH Corp.,* 956 P.2d 468, 474 (Alaska 1998).

**50.** *Power Constructors, Inc. v. Taylor & Hintze,* 960 P.2d 20, 29 (Alaska 1998).

**51.** *Grimes v. Haslett,* 641 P.2d 813, 818 (Alaska 1982).

court should have considered whether the tug was subject to a licensing exception was not raised in the trial court.[52] The facts necessary to support the argument that the tug could have been engaged in work that might render it an exception to the licensing requirement were raised by Captain George Reid but no exception was ever argued to the trial court.[53] As such, the argument has been waived and we decline to consider it.[54] We conclude that whether MSS was in violation of the regulation at the time of the accident was appropriately decided as a matter of law.

▬ The second regulation that MSS violated is Rule 5 of the Convention on the International Regulations for Preventing Collisions at Sea (COLREGS). It provides for a lookout at all times:

> Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.[55]

The trial court presented to the jury the question whether MSS had a proper lookout. MSS argues that the trial court erred in instructing the jury on Rule 5 because it was intended to prevent collisions and there was no collision in this case. MSS also claims that Horton presented insufficient evidence to support the jury's finding.

▬ MSS argues that Rule 5 "has no pertinence to this case." We disagree. Rule 5 requires a proper lookout in order to avoid collisions. In general, it is established that violation of the "lookout rule" triggers *The Pennsylvania* Rule, thus shifting the burden

of proof.[56] According to Horton, he was injured when Captain Adams was attempting to avoid a collision with a barge moored at the North Star Dock. Adams apparently tried to turn the tug to avoid a collision when the starboard engine died. In the meantime, Horton ran to the forward part of the barge to signal Adams about the impending collision. Adams managed to get the engine started again, gave the engines full power, and the movement of the tug jerked the tow line against the barge. That tow line swept across the deck of the barge and crushed Horton's legs against the steel weatherwall. According to his own testimony, Adams was focused principally on avoiding a collision with the barge at the dock. Because the failure to maintain a lookout could reasonably have led to the series of events that resulted in Horton's injury, the trial court did not err in instructing the jury on Rule 5.

In a related argument, MSS claims there was insufficient evidence to support the jury verdict that MSS violated Rule 5. MSS points out that Adams testified he could see everything he needed to see in order to avoid a collision, suggesting that a lookout may not have made a difference. That was an issue for the jury, which ultimately disagreed with MSS.

### 7. It was not error to pose a single question on Horton's comparative negligence.

MSS next argues that the trial court's "failure to assiduously separate and define Horton's Jones Act and unseaworthiness claims ... including the degree to which the jury found Horton comparatively at fault un-

---

**52.** MSS now seems to claim that the tug was subject to an exception provided in 46 C.F.R. § 15.610 for vessels "of less than 200 gross tons engaged in the offshore mineral and oil industry." 46 C.F.R. § 15.610 (1996) (amended Nov. 19, 1999).

**53.** There is no indication of this argument having been raised either during trial or in MSS's opposition to Horton's motion for summary judgment as to liability for violation of the COLREG 5, discussed *infra*, and the Coast Guard licensing regulation. Instead, MSS argued that Adams's lack of an adequate license was imputed to Horton.

**54.** *Pierce v. Pierce*, 949 P.2d 498, 500 (Alaska 1997) ("As a general rule, an issue that was not raised in the trial court will not be considered on appeal.").

**55.** International Regulations for Preventing Collisions at Sea, July 15, 1977, Part B, sec. 1, Rule 5, 28 U.S.T. 3459.

**56.** *Trinidad Corp. v. S.S. Keiyoh Maru*, 845 F.2d 818, 826 (9th Cir.1988); *Illinois Constructors Corp. v. Logan Transp., Inc.*, 715 F.Supp. 872, 883 (N.D.Ill.1989).

der each claim" in verdict question 17 constitutes reversible error. Question 17 asked:

What is the percentage of fault for which each party is responsible?

Marine Solution Services, Inc. (negligence and/or unseaworthiness)

Thomas Horton (negligence)

The jury attributed eighty-five percent of the fault to MSS and fifteen percent to Horton. MSS contends that the Jones Act negligence and unseaworthiness claims should have been separated to allow the jury to determine Horton's comparative fault under each claim. This is a question of law to which we apply our independent judgment.[57]

We first note that both parties were involved in the preparation of this verdict form, and if MSS disagreed with combining comparative negligence into a single question, it should have objected at the appropriate time. Alaska Rule of Civil Procedure 51(a) provides that "[n]o party may assign as error the giving or the failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection." Regardless, MSS's argument fails for other reasons. Unseaworthiness and Jones Act negligence are separate claims, each with distinct elements.[58] The court instructed the jury on the elements of each claim. MSS's contention that the separate causes of action required the jury to separately determine a percentage of fault is unpersuasive. Because all of Horton's claimed damages arose out of a single incident, submission of a single interrogatory regarding Horton's possible comparative negligence was appropriate.[59]

When all of the claimed damages stem from a single event, a single interrogatory concerning the amount of damages may then be submitted, for, in that event, dam-

ages are framed in terms of operational occurrences, i.e., the accident or event, but causation must be determined in light of the separate standards of proof.[60]

It is undisputed that there was a single event in this case. The jury found for Horton on both claims arising out of that single incident. The fact that the trial court did not require the jury to apportion the percentage of comparative negligence for each of the two causes of action was not error because there is no conceivable way to separate them when damages arise out of a single event. We conclude that the trial court did not err in posing a single verdict question on Horton's comparative negligence.

8. **The trial court did not abuse its discretion in declining to instruct the jury on primary duty and unsafe means.**

MSS also argues that the trial court erroneously refused to give jury instructions on primary duty and unsafe means. The trial court has broad discretion to determine what instructions should be given in a particular case.[61] A review of both the primary duty and unsafe means doctrines suggests that neither applies in this case.

The primary duty rule provides that "a seaman-employee may not recover from his employer for injuries caused by his own failure to perform a duty imposed on him by his employment."[62] There are three limiting principles:

First, the "primary duty" rule will not bar a claim of injury arising from the breach of a duty that the plaintiff did not consciously assume as a term of his employment. Second, the rule does not apply where a seaman is injured by a dangerous condition that he did not create and, in the proper exercise of his employment duties, could not have controlled or eliminated. Third, the rule applies only to a knowing violation

**57.** See *Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 759 (Alaska 1999).

**58.** *Comeaux v. T.L. James & Co.*, 702 F.2d 1023, 1024 (5th Cir.1983)

**59.** *Fontenot v. Teledyne Movible Offshore, Inc.*, 714 F.2d 17, 19 (5th Cir.1983).

**60.** *Comeaux*, 702 F.2d at 1025.

**61.** *Chenega Corp. v. Exxon Corp.*, 991 P.2d 769, 776 (Alaska 1999).

**62.** *Cal. Home Brands, Inc. v. Ferreira*, 871 F.2d 830, 836 (9th Cir.1989).

of a duty consciously assumed as a term of employment.[63]

The primary duty rule has only been applied in circumstances where the seaman neglected his own particular duty and was injured as a result. For example, in *Walker v. Lykes Brothers*, a heavy file cabinet fell and crushed the leg of the ship's master.[64] The master, who had a duty to keep the ship safe and seaworthy, had known that the file cabinets were not properly secured for several months, yet he had neglected to have them repaired.[65] The primary duty rule barred the ship master's claim.[66] In general, courts have limited the primary duty rule, sometimes even when the seaman failed to perform his own duty.[67]

In this case, when questioned by Judge Shortell, MSS could not identify a duty that Horton was under at the time of the accident, much less a knowing violation of a consciously assumed duty. MSS did argue that Horton's duty was "[t]o decide when [ ] and on what tide ... that barge was going to be moved." However, this contention does not fit within the parameters of the primary duty rule. We conclude that the trial court was within its discretion when it declined to instruct the jury on primary duty.

 MSS also requested a jury instruction on "unsafe means." "Unsafe means" is a rarely used doctrine that is similar to primary duty. It provides that if there are two ways to perform a task, and one is dangerous, the seaman who consciously chooses the unsafe means of performance may not recover.[68] MSS has not pointed to a

task, or to two ways of performing it, or much less to any evidence that Horton chose an unsafe option. But perhaps more important here is the fact that the doctrine has been rejected in other circuits.[69] This may be because there is some confusion as to the difference between primary duty and unsafe means.[70] More importantly, a seaman's own negligence is already considered in apportioning liability.[71] In any event, it is not a widely used or clearly defined doctrine and it does not fit the facts of this case. The trial court properly declined to instruct the jury on unsafe means.

### 9. The Jones Act award may not be reduced by comparative negligence.

MSS's next argument is that the trial court erred by failing to reduce the jury award by the fifteen percent fault allocated to Horton by the jury. The trial court determined that the award would not be reduced by Horton's comparative negligence "since the jury found that [MSS] violated federal safety regulations and failed to carry its burden under the [*Pennsylvania*] rule." This presents a question of law to which we apply our independent judgment.[72]

 Because Horton prevailed on two distinct legal theories, we will discuss the implications of the jury's assignment of comparative negligence on each. We first address Horton's Jones Act claim. The Jones Act explicitly incorporates the Federal Em-

---

**63.** *Bernard v. Maersk Lines, Ltd.*, 22 F.3d 903, 907 (9th Cir.1994).

**64.** 193 F.2d 772, 773 (2d Cir.1952).

**65.** *Id.*

**66.** *Id.* at 774–75.

**67.** *See, e.g., Yehia v. Rouge Steel Corp.*, 898 F.2d 1178 (6th Cir.1990) (holding that claims of deck hand cleaning oily deck were not barred by primary duty rule since deck hand had neither duty nor ability to remove *all* oil from deck).

**68.** *Peymann v. Perini Corp.*, 507 F.2d 1318, 1322 (1st Cir.1974).

**69.** *See, e.g., Kelley v. Sun Transp. Co.*, 900 F.2d 1027, 1031 (7th Cir.1990).

**70.** "Unsafe means" closely resembles the third limiting principle of the primary duty rule. That is, unsafe means has evolved to apply when the seaman had knowledge of a dangerous condition and also a duty to remedy it. *Kelley v. Sun Transp. Co.*, 900 F.2d 1027, 1030–31 (7th Cir. 1990).

**71.** As mentioned above, comparative negligence is already considered in Jones Act and unseaworthiness claims, and indeed Horton was found to be fifteen percent at fault.

**72.** *Kodiak Island Borough v. Exxon Corp.*, 991 P.2d 757, 759 (Alaska 1999).

ployers' Liability Act (FELA).[73] FELA precludes the reduction of an award for comparative negligence where the common carrier violated a safety statute that contributed to the injury of the employee:

> In all actions on and after April 22, 1908 brought against any such common carrier by railroad under or by virtue of any of the provisions of this chapter to recover damages for personal injuries to an employee, or where such injuries have resulted in his death, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee: *Provided,* That *no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.*[74]

(Emphasis added.) Interpreting this statute, the United States Supreme Court concluded that when an employee is injured as a result of the employer's violation of a statute, the employer is liable even if the injury was not one the statute was specifically aimed at protecting against.[75]

The Fifth Circuit then applied this rule to a violation of the Coast Guard manning statute providing that a vessel may not be navigated unless it has the full crew specified in its certificate of inspection.[76] The court extensively reviewed the history of the statute and determined that it had been enacted for the safety of the crew; the court therefore concluded that damages could not be reduced by the employee's comparative negligence even though the jury found him seventy-five percent negligent.[77] Furthermore, the Fifth Circuit rejected as contrary to the language of FELA the employer's argument that the court should take account of an employee's comparative negligence where that negligence consists of "deliberate acts." [78]

In *Fuszek v. Royal King Fisheries, Inc.,* the Ninth Circuit applied this rule where the employer was in violation of a Coast Guard regulation requiring that all exposed machinery on board a vessel have suitable hand covers.[79] A fish processing marine technician reached his hand inside the machine while it was running to clear a jam and his hand was crushed.[80] The trial court found him twenty-five percent comparatively negligent and accordingly reduced his damages, but the Ninth Circuit reversed, ruling that the vessel was "in unexcused violation of a Coast Guard safety regulation that was designed not only to protect members of the class to which [the injured person] belonged, but also to prevent the type of injury he sustained." [81] The Ninth Circuit further noted that this decision comported with the Fifth Circuit rule [82] as well as its own prior decisions.[83]

Here, the trial court determined that MSS was in violation of a Coast Guard licensing regulation, and the jury found that MSS was in violation of Rule 5 of the COLREGS (the

---

**73.** 46 U.S.C. app. § 688(a) (2002); *Roy Crook & Sons, Inc. v. Allen,* 778 F.2d 1037, 1038 (5th Cir.1985).

**74.** 45 U.S.C. § 53 (2002).

**75.** *Kernan v. Am. Dredging Co.,* 355 U.S. 426, 432–33, 78 S.Ct. 394, 2 L.Ed.2d 382 (1957); *see also Roy Crook & Sons,* 778 F.2d at 1039.

**76.** *Roy Crook & Sons,* 778 F.2d at 1041–42 (applying rule to 46 U.S.C. § 222 as replaced by 46 U.S.C. § 8101(d)).

**77.** *Id.* at 1042–43.

**78.** *Id.* at 1043.

**79.** 98 F.3d 514, 516–17 (9th Cir.1996) (interpreting 46 U.S.C. § 4502(b)(2)G and 46 C.F.R. § 28.215).

**80.** *Id.* at 515.

**81.** *Id.* at 517.

**82.** *Id.* (referring to *Roy Crook & Sons,* 778 F.2d at 1041, 1043 and *Smith v. Trans–World Drilling Co.,* 772 F.2d 157, 160 (5th Cir.1985)).

**83.** *Id.* at 517 (referring to *Kopczynski v. The Jacqueline,* 742 F.2d 555, 558–59 (9th Cir.1984) (noting that employee could have recovered without any reduction for comparative negligence if he had been injured at sea and his injuries had been due to negligence attributable to violation of Coast Guard regulation)).

lookout rule). The trial court found that the lookout rule was a safety regulation and that Horton was in the class of persons sought to be protected. We agree. Requirements that the captain of a vessel be licensed to operate that type of vessel and that the vessel have a lookout are both designed to ensure safety and to protect the vessel's crew. Moreover, the rule stated by the Ninth Circuit in *Fuszek* specifically referred to Coast Guard safety regulations, such as the licensing requirement in this case. Horton thus fits squarely within the *Fuszek* rule that in an action brought under the Jones Act, reduction of a seaman plaintiff's damages is prohibited where the employer is in unexcused violation of a statute or regulation designed to protect members of the class to which the seaman belongs and to prevent the type of injury sustained. The trial court thus did not err in declining to reduce Horton's Jones Act award. However, Horton did not just prevail on his Jones Act theory; the jury also found for him on his unseaworthiness claim. Thus, we must consider this latter claim in our discussion of reducing Horton's award for his comparative negligence.

[41–43] Unseaworthiness claims may be reduced for comparative negligence. "Maritime law has [ ] long applied the rule of comparative fault in a seaman's unseaworthiness action against a shipowner." [84] In a case where unseaworthiness and Jones Act negligence are tried together, and the jury makes a single damage award and a general determination of comparative negligence—without apportioning comparative fault to each cause of action—the entire award would simply be diminished by the percentage of the plaintiff's fault. [85] In that situation, the Jones Act award and the unseaworthiness award would comprise a single uniform award. However, that cannot be the case here. Horton's damages award cannot be

viewed as a single award flowing from both his unseaworthiness and Jones Act claims, given that under *The Pennsylvania* Rule his Jones Act claim cannot be reduced for comparative negligence. Therefore, if on remand, the trial court characterizes the damages award as a Jones Act award, it may not reduce the amount by Horton's comparative negligence. If, however, the award is characterized as an unseaworthiness award, the damages may be reduced by fifteen percent.

## 10. Horton is entitled to prejudgment interest only on his unseaworthiness claims.

[44] MSS's final point on appeal is that the trial court erroneously denied its motion to vacate the prejudgment interest awarded to Horton by the jury. MSS contends that where one award of damages is made for claims of Jones Act negligence and unseaworthiness, prejudgment interest is not allowed. We review de novo whether a trial court correctly applied legal rules pertaining to prejudgment interest. [86]

[45] The general rule appears to be that where Jones Act negligence and unseaworthiness are tried together, prejudgment interest may be awarded only on that part of the damages attributable solely to unseaworthiness. [87] Prejudgment interest is generally not permitted on Jones Act claims. [88] Since the jury in this case was asked to calculate damages for both claims together, prejudgment interest for only the unseaworthiness claim cannot be separated out, and therefore, under this rule, Horton would not be entitled to prejudgment interest at all.

[46] Here, however, we have concluded that the Jones Act claim cannot be reduced for comparative negligence and that therefore there is not a uniform single award for

**84.** *Knight v. Alaska Trawl Fisheries, Inc.*, 154 F.3d 1042, 1047 (9th Cir.1998).

**85.** *Fontenot v. Teledyne Movible Offshore, Inc.*, 714 F.2d 17, 19 (5th Cir.1983).

**86.** *City of Seward v. Afognak Logging*, 31 P.3d 780, 783 (Alaska 2001).

**87.** *McPhillamy v. Brown & Root, Inc.*, 810 F.2d 529, 531–32 (5th Cir.1987); *Petersen v. Chesa-*

*peake & Ohio Ry. Co.*, 784 F.2d 732, 741 (6th Cir.1986); *Wyatt v. Penrod Drilling Co.*, 735 F.2d 951, 956 (5th Cir.1984).

**88.** *McPhillamy*, 810 F.2d at 532 n. 1 (holding that prejudgment interest is only disallowed when case is tried by jury, but is discretionary when tried before the court).

both the Jones Act and unseaworthiness claims. Consequently, prejudgment interest can only be awarded on the damages award if it is characterized as an unseaworthiness claim and is thus subject to reduction for comparative negligence but not if it is characterized as a Jones Act claim. It is interesting to note that because there is no reduction for comparative negligence but also no allowance for prejudgment interest in this Jones Act claim, while reduction for comparative negligence and prejudgment interest are permitted in the unseaworthiness claim, calculation of the total judgment under each claim appears to reach virtually the same result in the present case. On remand, the superior court shall perform both calculations and award Horton whichever judgment amount is greater.[89]

### B. Horton's Cross–Appeal

#### 1. Reasonable persons could differ as to whether Horton had achieved maximum cure.

■■■ Horton first claims in his cross-appeal that no reasonable person could have found Horton was at maximum cure and, therefore, the jury verdict should be reversed. Specifically, Horton alleges that there was no evidence to support the jury's decision that Horton had reached maximum cure. We will reverse the jury's finding only if the evidence is "so clearly to the contrary that 'reasonable persons could not differ in their judgment.'"[90]

■■■ "Maintenance and cure" is a doctrine that applies to seamen injured while "in the service of the ship."[91] Maintenance is a sum for living expenses during the period of treatment and convalescence, and cure pays for medical expenses. An injured seaman is entitled to cure until the seaman is at maximum cure, meaning the point at which no improvement in the seaman's medical condition is to be reasonably expected.[92] Cure is limited to "curative, as opposed to palliative, medical treatment."[93]

■■■ Considering the high standard applicable to the jury's determination and the testimony before the court, reasonable persons could differ as to whether Horton had reached maximum cure. Horton's own orthopedic surgeon, Dr. Vasileff, testified that he would not recommend any further medical treatment for Horton:

Q: The last time you saw him, would you have recommended any further treatment for the leg or ankle?

A: No.

Q: Or not—leg or the foot, excuse me.

A: No.

Q: Okay. And why is that?

A: Well, it was—the fracture was healing, the—I thought we probably did what we could. Now, in terms of the nerve pain, certainly, that could have—you know, you could investigate that further to see if something could be done.

Dr. Brown, who treats Horton's diabetes,[94] testified that Horton has chronic pain and depression. Dr. Brown is not a psychiatrist however. Dr. Craig, a clinical neuropsychologist, testified that chronic pain treatment is geared toward helping "people learn how to cope with the discomfort." He then added, "there's nothing magical about pain pro-

---

89. *See Magee v. United States Lines, Inc.,* 976 F.2d 821, 823 (2d Cir.1992) (holding that in cases involving Jones Act and unseaworthiness claims where a single award of damages is made, "the successful plaintiff [should] be paid under the theory of liability that provides the most complete recovery") (citations omitted).

90. *Alaska Democratic Party v. Rice,* 934 P.2d 1313, 1320 (Alaska 1997) (quoting *Diamond v. Wagstaff,* 873 P.2d 1286, 1290 (Alaska 1994)).

91. *The Osceola,* 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903). The term "in the service of the ship" is liberally construed. *See Warren v. United States,* 340 U.S. 523, 529–30, 71 S.Ct.

432, 95 L.Ed. 503 (1951); *Koistinen v. Am. Export Lines, Inc.,* 194 Misc. 942, 83 N.Y.S.2d 297 (1948).

92. *Vella v. Ford Motor Co.,* 421 U.S. 1, 4–6 n. 5, 95 S.Ct. 1381, 43 L.Ed.2d 682 (1975).

93. *Nasser v. CSX Lines, LLC,* 191 F.Supp.2d 307, 317 (E.D.N.Y.2002); *Sefcik v. Ocean Pride Alaska, Inc.,* 844 F.Supp. 1372, 1373 (D.Alaska 1993).

94. The jury found that Horton's diabetes was not related to his injuries. The issue has not been appealed.

grams that's going to make the discomfort just go away...." In other words, the expert witnesses did suggest "stabilizing" treatments, but it is questionable whether Horton's pain or depression would improve or could be cured over time. We conclude that reasonable persons could differ as to whether Horton had reached maximum cure and therefore we will not overturn the jury verdict.

### 2. MSS is entitled to an offset.

■ Horton's second claim is that the trial court improperly reduced the jury award for cure by deducting the medical bills already paid by MSS. Essentially, Horton argues that there is no evidence that MSS actually paid any of Horton's medical bills and that whether MSS is entitled to an offset is a jury question. This argument has little merit.

MSS and Horton stipulated to Horton's medical bills. The jury awarded the entire amount, less the expenses for diabetes since the jury found that condition to be unrelated to Horton's injuries. During the trial, Horton attempted to introduce evidence of medical bills paid by MSS but was prevented from doing so by the trial court.[95] After the trial, MSS moved to reduce the jury award for cure by $122,030.76, the amount paid by MSS for medical bills arising from Horton's injuries. The trial court observed that there was no dispute that the bills had been paid:

> There is no factual dispute between the parties regarding the sum paid nor is there dispute that the $122,030.76 was paid on behalf of the defendant for medical expenses arising out of plaintiff's injuries.... [T]here are no factual issues to be resolved. Both agreed that the issue to be decided here is simply a legal one.
>
> ....

There is no legitimate dispute here. The plaintiff had a total of $186,000 in medical/cure expenses. The defendant paid $122,030.76 of those expenses. The defendant should be given credit for those payments.

We agree with the trial court and reject Horton's argument that he should get what amounts to a double recovery of medical expenses.

### 3. Horton is entitled to an enhancement of prejudgment interest only.

Horton claims that he is entitled to enhancement of prejudgment and postjudgment interest because MSS failed to achieve a verdict more favorable to it than Horton's offer of judgment made under the former Alaska Rule 68. MSS counters that prejudgment interest enhancement is not available because it conflicts with federal law and that statutory provisions for prejudgment interest do not provide for postjudgment interest. This issue presents a question of law to which we apply our independent judgment.[96]

#### a. Prejudgment interest

■ Before trial, Horton made an offer of judgment for $950,000 plus costs, prejudgment interest, and attorney's fees. The jury ultimately awarded Horton $175,000 in past damages and $1,155,000 in future damages as well as ten percent interest on his past losses. Horton claimed entitlement to an enhancement based on the former Alaska Civil Rule 68 that provided that if the judgment rendered was not more favorable to the offeree than the offer, the prejudgment interest accrued would be increased by five percent as specified in the former AS 09.30.065.[97] The trial court initially added

**95.** The trial court granted a motion in limine on this issue because it determined that Horton was going to use the evidence of insurance coverage and medical payments for an improper purpose. Introduction of evidence that shows payment of medical and similar expenses is not admissible to prove liability. Alaska R. Evid. 409. In addition, evidence that a person was insured against liability is not admissible to prove negligence. Alaska R. Evid. 411. Even relevant evidence "may be excluded if its probative value is out-

weighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Alaska R. Evid. 403.

**96.** *City of Seward v. Afognak Logging*, 31 P.3d 780, 783 (Alaska 2001).

**97.** This case was filed before August 7, 1997 and therefore the former versions of Rule 68 and AS 09.30.065 apply.

the enhancement, increasing prejudgment interest to fifteen percent per year and postjudgment interest to 12.545%. The trial court later revised that decision and determined that Horton would receive ten percent prejudgment and 7.545% postjudgment interest; the trial court removed the five percent enhancement from both interest rates. It is the removal of the enhancement that Horton now appeals.

Because Horton made an offer for judgment for $950,000 and was ultimately awarded more than $1,300,000, he should qualify for the enhancement. However, whether the enhancement applies depends upon whether the trial court characterizes Horton's damages award as a Jones Act or unseaworthiness award. We have established that Horton is not entitled to prejudgment interest on his Jones Act claim. Consequently, he cannot receive an enhancement of prejudgment interest if his award is characterized as a Jones Act award.[98] However, if the trial court characterizes Horton's damages award as an unseaworthiness award, he is entitled to an enhancement of prejudgment interest.[99]

### b. Postjudgment interest

Horton also argues that postjudgment interest should have accrued at 10.5% under the former AS 09.30.070(a) and that he is entitled to an enhancement of that interest as well. MSS maintains that the statute and Rule 68 do not apply to postjudgment interest at all and thus neither does the enhancement. The trial court awarded postjudgment interest at the rate of 7.545%.

■ At the time this action was filed, the former version of AS 09.30.070(a), the statute providing for interest on judgments, provided that "[t]he rate of interest on judgments and decrees for the payment of money is 10.5 percent a year." It appears that the parties presented the new version of AS 09.30.070(a) to the trial court, and accordingly the trial court may have calculated the interest at three percentage points above the 12th Federal Reserve District discount rate in effect as required by the new version of AS 09.30.070(a). Perhaps this explains why the trial court specified a rate of 7.545%. However, the statute in effect at the time this case was filed provides that interest is to be set at 10.5%. Further, the new statute provides that it applies "to all causes of action accruing on or after August 7, 1997," thus clearly implying that it was not meant to apply to causes of action accruing before that date.[100] The trial court's use of the wrong statute to calculate postjudgment interest constitutes plain error, and we reverse and remand to correct the judgment and set the interest rate at 10.5 percent.

■ Horton, however, is not entitled to an enhancement of postjudgment interest. Horton argues that the enhancement applies to postjudgment interest because the former version of AS 09.30.065 only generally refers to "judgment" and "the interest rate" and is not explicitly limited to prejudgment interest. However, as MSS points out, AS 09.30.065 also refers to "the interest awarded under AS 09.30.070 and *accrued up to the date judgment is entered.*" (Emphasis added.) We have interpreted this provision as referring only to prejudgment interest.[101] In addition, the purpose of the enhancement was to encourage settlement and discourage protracted litigation on less meritorious claims;

**98.** Horton argues that because Rule 68 is a procedural and not substantive provision he may receive an enhancement of prejudgment interest on his Jones Act award; however, we need not address this argument because enhancement of prejudgment interest only applies to unseaworthiness.

**99.** *See McPhillamy v. Brown & Root, Inc.,* 810 F.2d 529, 532 n. 1 (5th Cir.1987) (noting "[t]he award of prejudgment interest under maritime law is 'well-nigh automatic' ").

**100.** Ch. 26, § 55, SLA 1997.

**101.** *Andrus v. Lena,* 975 P.2d 54, 57 (Alaska 1999) ("Where the party defending against the claim rejects an offer of judgment more favorable to the offeree than the final judgment, the superior court must increase the prejudgment interest award by five percent.").

accordingly, the "penalty" of the enhancement should only apply to the period before judgment. Therefore, Horton is entitled to an enhancement of prejudgment interest only; the enhancement provision does not apply to postjudgment interest.[102]

## IV. CONCLUSION

The jury made a single damage award to Horton who brought claims under both the Jones Act and unseaworthiness theories. Because there is no reduction for comparative negligence but also no allowance for prejudgment interest in his Jones Act claim, while both reduction for comparative negligence and prejudgment interest are permitted in his unseaworthiness claim, the superior court should perform alternate calculations of the total judgment under each claim. Horton will be entitled to the larger of the two judgments. Furthermore, if the trial court characterizes his damages award as an unseaworthiness award, Horton is entitled to the statutory five percent enhancement on prejudgment interest only. Postjudgment interest was erroneously set by the trial court under the new version of the statute and should be recalculated at 10.5% to reflect the statute in effect at the time the complaint was filed. We REVERSE and REMAND for corrected judgment on these points. In all other respects, the trial court's judgment is AFFIRMED.

**102.** Because the jury found that Horton was a seaman and there is no error in the jury instruc-tion, Horton's claims against Adams are moot and we need not consider them.