Jerry **KINN**, Valley Motors, Inc., and Kinn/Singletary Partnership, Appellants/Cross–Appellees,

v.

**ALASKA SALES & SERVICE, INC.,** Appellee/Cross–Appellant.

Nos. S–11748, S–11768.

Supreme Court of Alaska.

Sept. 29, 2006.

---

Susan E. Reeves, Anchorage, for Appellants and Cross–Appellees.

Barbra Z. Nault and Jon T. Givens, Bankston Gronning O'Hara, P.C., Anchorage, for Appellee and Cross–Appellant.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

This appeal arises from an arbitration decision regarding the sale of two lots of land used for an automobile dealership in Wasilla. After purchasing the lots and the dealership located thereon from Jerry Kinn and Charles Singletary, Alaska Sales and Service brought an action against them on the grounds that the property was contaminated. The arbitrator partially rescinded the contract and awarded additional damages and attorney's fees to Alaska Sales and Service. Kinn and Singletary appealed the arbitrator's decision to the superior court, alleging that there was "evident partiality" on the part of the arbitrator, and that the arbitrator exceeded his powers by partially rescinding the contract. The superior court affirmed.

Both parties now appeal the superior court's decision. Kinn and Singletary contend that the superior court committed four reversible errors: (1) holding that the arbitrator was not biased; (2) affirming the partial rescission of the contract; (3) issuing a final judgment under Alaska Civil Rule 54(b) while their claims against other parties were still pending; and (4) requiring certain future claims related to the dispute to be brought before the arbitrator. Alaska Sales and Service does not challenge the holdings regarding partiality and rescission, but it claims that the superior court erroneously decided four minor issues that should have been re-manded to the arbitrator: (1) the amount of attorney's fees; (2) the rate of postjudgment interest; (3) the method of tender of the rescission deed; and (4) the appropriate form of the rescission deed. For the reasons set forth below, we affirm the superior court's decision on all issues.

## II. FACTS AND PROCEEDINGS

### A. Background

#### 1. Kinn and Singletary's acquisition of the property

The property at issue consists of an automobile dealership, Valley Motors, Inc., and two underlying parcels of land. According to Kinn, he and Singletary purchased the two lots, as well as eighty percent of the dealership's stock, with an option to purchase the remaining twenty percent from Richard Hagen in June 1995. In a third-party claim against Hagen, Kinn and Singletary assert that "Hagen represented that there were no violations of environmental laws or regulations, nor any liability for environmental damages and that the modifications made to the building and other structures, and the oil recovery tank located on and sold as part of the Property, were built and installed in compliance with all applicable codes, laws and regulations." The septic systems, oil-water separator, and underground oil recovery tank were allegedly installed by Hagen. For the next five years, Kinn and Singletary owned the property as tenants in common and were shareholders in Valley Motors, Inc. Kinn claims that he "did not personally have any knowledge regarding the condition of the property."

#### 2. Alaska Sales and Service's purchase of the property

In December 2000 Kinn and Singletary entered into a "Contract for Sale of Real Property" and an "Asset Purchase Agreement" with Alaska Sales and Service. The former provided for the sale of the two lots underlying the dealership, and the latter provided for the sale of the dealership itself. Kinn and Singletary claim that Alaska Sales and Service originally sought to purchase only the dealership, but that they refused to

sell the dealership without also selling the land.

### 3. Alaska Sales and Service's discovery that the property was contaminated

Several months after acquiring the land, Alaska Sales and Service discovered that the property had been contaminated by used motor oil, which had overfilled the underground tank, migrated through the oil-water separator, and contaminated the septic system. There were also illegal surface spills, some of which the arbitrator found that Singletary attempted to conceal.[1] The Alaska Department of Environmental Conservation and the federal Environmental Protection Agency had not been notified of, and did not approve, the design of the oil and septic system.

After discovering that the property was contaminated, Alaska Sales and Service requested that Kinn and Singletary "take all necessary actions to immediately resolve the problem[ ]" and sought to be indemnified for expenses associated with the contamination. These demands, and Alaska Sales and Service's subsequent request to rescind the contract, were rejected.

### B. Proceedings Before the Arbitrator

### 1. Alaska Sales and Service's lawsuit

In December 2002 Alaska Sales and Service brought an action against Kinn and Singletary, asserting a number of claims, including misrepresentation and breach of contract. Alaska Sales and Service's complaint also sought enforcement of the real estate contract's arbitration provision, and in March 2003 Kinn and Alaska Sales and Service agreed to arbitration.[2] Singletary did not sign the stipulation regarding arbitration, but he was a party to the original contract providing for arbitration. Kinn and Singletary brought a third-party claim against Hagen in May 2003, but this claim was not included in the arbitration. The arbitrator who heard the case was Paul Davis, an Anchorage attorney.

### 2. Factual findings regarding contamination

The dispute was arbitrated in 2003, and the arbitrator issued findings of fact, conclusions of law, and a final award. He subsequently issued supplemental findings of fact and conclusions of law, a revised final award, and a summary of all awards. The initial findings of fact stated that both lots had been contaminated in violation of federal and state environmental laws, and that Kinn and Singletary had "intentionally misrepresented substantial and material historical environmental events that Mr. Singletary had direct, personal knowledge of ... for the purpose of causing [Alaska Sales and Service] to enter into the transactions." The arbitrator further found that both the real estate contract and the asset purchase agreement contained misrepresentations about whether the property was contaminated, and that Alaska Sales and Service reasonably relied on the misrepresentations.

In addition to liability under contract, the arbitrator found that each of the defendants had violated AS 46.03.822(a), which imposes strict liability for the costs "resulting from an unpermitted release of a hazardous substance." As the arbitrator's opinion noted, "the actions of Mr. Singletary in directing employees to shovel up the oiled gravel, place it into opaque bags, deposit[ ] the bags at the dump and replac[e] the removed gravel with clean gravel taken from a river bed represent[ ] an intentional violation of state, federal, and, probably, local environmental laws."

### 3. Allocation of responsibility

The arbitrator found that "Mr. Kinn's sins were more of omission rather than commission," but noted that "Kinn and Singletary

---

1. The arbitrator found that Singletary's denial of knowledge of the surface spills was "not at all credible," and further found that Singletary had "direct[ed] employees to shovel up the oiled gravel, place it into opaque bags, deposit[ ] the bags at the dump and replac[e] the removed gravel with clean gravel taken from a river bed."

2. The arbitration provision specified that "[a]ll disputes shall be resolved by a single arbitrator in accordance with the Rules and Procedures of the American Arbitration Association pertaining to commercial disputes."

were equally irresponsible" in their management of the land because neither of them "made any effort whatsoever to understand the functioning of what they owned or what the infrastructure's capabilities and weak points were." Although Kinn and Singletary denied the existence of a partnership, the arbitrator found that they had been partners during their ownership of the property, and that, "[a]s partners[,] . . . Mr. Kinn and Mr. Singletary are individually jointly and severally liable for Mr. Singletary's acts and omissions."[3] But elsewhere in the opinion, the arbitrator noted that each had the right to pursue a contribution claim from the other in superior court.[4]

## 4. Award

Noting that rescission is available for a party who enters a contract based on justifiable reliance on a misrepresentation, the arbitrator discussed the merits of this remedy:

> Although I would have the power to reject rescission and award that the defendants [Kinn and Singletary] pay all future cleanup costs, I believe doing so would create an almost unmanageable situation where the defendants would challenge many of the decisions made by [Alaska Sales and Service]. . . . Should that be so, we could confidently expect that the parties would have to again and again return to the court to seek enforcement of my award, all the while generating even more attorney['s] fees and costs. Because a legal remedy is uncertain, I find rescission to be the better course.

> Rescission seems to be the only fair relief that can be given because of the degree of speculation that all of the parties have had to engage in up to this point in the litigation. There are a number of significant unknowns concerning the extent of contamination and the amount of future costs for investigation, evaluation, and remediation and monitoring.

The arbitrator also noted that, "insofar as the defendants are concerned, rescission will allow them to take over the remediation of the land on their own terms."

The arbitrator therefore rescinded the real estate contract and ordered the defendants to "repay . . . the purchase price of the property, less the reasonable rental rate for [Alaska Sales and Service's] use of the property since January 1, 2001 for a total of $1,211,928.00." As noted in the summary of all awards, the defendants were also required to pay several other types of damages: (1) "[r]escission [t]ransactional [d]amages" of $67,060.00; (2) ongoing "rescission damages of interest," which amounted to $308,209.70 as of July 15, 2003; (3) 100% of the ongoing costs of cleaning up Lot 3; (4) eighty percent of the ongoing costs of cleaning up Lot 7; (5) Alaska Sales and Service's costs in bringing the action, including but not limited to litigation attorney's fees of $181,782.50; (6) additional post-award litigation and cleanup costs incurred by Alaska Sales and Service; (7) pre- and post-award interest; and (8) the arbitrator's fee. Alaska Sales and Service was ordered to pay rent of $15,968.00 a month and all utilities while it continued to occupy the land, and was also required to pay twenty percent of the cleanup costs of Lot 7.

## 5. Allegation of partiality

In August 2003, shortly after arbitrator Paul Davis issued his supplemental findings, attorney Susan Reeves sent Davis a letter claiming that she had recently learned of undisclosed ties between Davis and Bill Bankston, counsel for Alaska Sales and Service. In her capacity as counsel to Kinn and Singletary, Reeves requested that Davis "disclose and describe any business dealings that you presently have, have had in the past year, or anticipate in the next 6 months, with Mr. Bankston or his law firm."

Davis sent a letter to Reeves and Bankston stating that he had had prior dealings with the firms representing both sides. He and

---

3. The question whether a partnership existed is not disputed in this appeal.

4. According to the appellants, Singletary has no assets. Singletary maintained in a January 2004

affidavit that the sale of the business was "financially devastating for [him]," and that he had only been employed for a total of six weeks in 2003.

Bankston had both been involved in *Veco Alaska, Inc. v. Alaska Electric Generation & Transmission, Inc.*, a case that was settled in January 2003. Davis explained that he "acted as counsel for a codefendant to Mr. Bankston's client," and noted that "[a]lthough our clients were aligned, there were independent interests of my client that were separate from the interest[s] of Mr. Bankston's client."[5] He pointed out that there was one remaining "collateral matter," and that if that matter developed into litigation, "Mr. Bankston and I will be representing opponents." In addition, Davis noted that he referred bankruptcy cases to a partner of Bankston "from time to time," and that Davis's partner, Ron Black, had recently referred a case to Bankston's office because of a conflict of interest. Davis maintained that he "d[id] not have reason to anticipate that Mr. Bankston will refer any other cases to me during the next six months."

Davis's letter also discussed his dealings with Tom Amodio, a member of Reeves's firm. Davis described Amodio as "a friend of mine, in much the same manner that Mr. Bankston has been," and noted that Amodio's wife, Debra Fitzgerald, "has performed substantial (and uniformly excellent) legal work for me on and off for close to twenty years, and I hold her as a close friend, even closer than either Mr. Amodio or Mr. Bankston." Amodio had referred several cases to Davis in the past, including one that had settled in the previous year, and Davis "ha[d] no reason to think that either Mr. Amodio will or will not refer cases to me within the next year." Davis also asserted that he had used space in Reeves's and Amodio's firm to prepare for a trial when his own firm was in the process of moving. Finally, Davis maintained that he had been approached to handle the present case by both Bankston and Amodio, and that, although he "was long time friends with both attorneys, had referred and/or been referred by both, and had personal dealings with both," neither side had raised doubts about his partiality at the outset.

In response to this letter, Reeves requested additional information about Davis's work in *Veco*, including the amount that Davis's firm had billed in that case, and whether Davis had spoken with Bankston about *Veco* during the arbitration of the present case. Although Reeves claims never to have received a response, the excerpt contains a letter from Davis answering Reeves's questions. In addition to discussing his work in *Veco* in greater detail, Davis noted that, when negotiating his retainer with the attorneys in the present case, he "told the group that because all of them were my friends I would not require that more [than one day's fees] be deposited." Davis addressed the issue whether he was biased toward Bankston because of his work in *Veco* as follows:

> Although not solicited by you, it is clear to me that you or your client are concerned that I might have loyalties to Mr. Bankston arising out of the *Agrium*[6] case. I want to make it perfectly clear that Agrium was *not* referred to me by Mr. Bankston or anyone in his office. Agrium was referred to me by Rick Baldwin.... Just prior to the referral to me, Mr. Baldwin's firm found themselves in a conflict because they represented both AEG & T and Agrium which, as I outlined above, had conflicting interests. Because of the conflict situation his firm was in, it was decided that the AEG & T client would be referred to Mr. Bankston's office, and the Agrium client would be referred to my office. I owe nothing to Mr. Bankston for that referral[;] he, along with myself, were the beneficiaries of Mr. Baldwin's judgment. If you have any questions in this regard, please call Rick Baldwin ... and I am sure he will confirm what happened.

Finally, in support of her argument that Davis was not impartial, counsel for Kinn and Singletary points to an advertisement for a continuing legal education program held in September 2003, which was coordinated by Bankston. The program featured Davis as

---

**5.** Davis stated that he "underst[oo]d that Mr. Bankston did recommend me, but the case was in fact referred to me by Rick Baldwin, an attorney in Kenai."

**6.** Davis's client in *Veco* was Agrium U.S.

one of two Anchorage attorneys on the plaintiff's team in a mock trial.

## C. The Superior Court's Decision

### 1. Ruling on Kinn and Singletary's appeal

In October 2003 Kinn and Singletary appealed the judgment of the arbitrator to the superior court, alleging that Davis had exceeded his powers by rescinding the real estate contract, had displayed "evident partiality," and had "exhibited a manifest disregard of the law" in his decision. Alaska Sales and Service moved for confirmation of the arbitration award. In May 2004, after oral argument, the superior court issued a ruling from the bench confirming the award. The court held that the rescission was within the arbitrator's authority, stating that "I ... don't find merit to the defendants' argument that the arbitrator could not rescind only the contract for the sale of real property and leave the asset purchase agreement in place." The court also determined that Davis and Bankston did not have the type of relationship that required disclosure to the parties and emphasized that "the vast majority of cases that have discussed whether there is evident partiality are concerned with th[e] financial interest that parties could—that the parties might have or the lawyers might have with the arbiter." In addition, the court observed "that this is a small legal community, [and] that you do tend to cross paths with just about everyone during the course of practicing here for decades at a time as Mr. Davis has done." Concluding that there was no "indication in the record that Mr. Davis had any interest, financial, personal or otherwise in the outcome of the dispute here," the court held that there was no evident partiality on the part of the arbitrator.

### 2. Civil Rule 54(b) order for final judgment

In accordance with the court's ruling, Alaska Sales and Service moved for entry of final judgment under Alaska Rule of Civil Procedure 54(b). Noting "Mr. Kinn's asset transfers in recent years," and specifically holding "that delaying entry of final judgment pursuant to the arbitration award, pending a trial between Hagen [and Kinn and Singletary] (on an unrelated sale of real estate which occurred years previous to the Alaska Sales purchase) would cause undue delay," the court granted the motion in June 2004.

Kinn and Singletary appeal the superior court's rulings that the arbitrator did not display evident bias, that partial rescission was within the arbitrator's powers, that final judgment should issue while the third-party claim was still pending, and that certain future disputes regarding the implementation of the final judgment should be submitted to the arbitrator. Alaska Sales and Service cross-appeals, claiming that the superior court erroneously decided four issues regarding the award that should first have been decided by the arbitrator.

## III. DISCUSSION

### A. Standards of Review

#### 1. Issues on appeal

 We review de novo a superior court's decision to affirm an arbitration award.[7] But "[t]he *arbitrator's* findings of both fact and law ... receive great deference"[8] and "as a matter of both policy and law, we are 'loathe to vacate an award made by an arbitrator.' "[9] Where one party alleg-

---

7. *Marathon Oil Co. v. ARCO Alaska, Inc.*, 972 P.2d 595, 600 (Alaska 1999); *see also Ahtna, Inc. v. Ebasco Constructors, Inc.*, 894 P.2d 657, 660 (Alaska 1995) (reviewing de novo a lower court's decision regarding an arbitration award).

8. *Ahtna*, 894 P.2d at 660.

9. *Id.* (quoting *Dep't of Public Safety v. Public Safety Employees Ass'n*, 732 P.2d 1090, 1093 (Alaska 1987)). As noted by the *Ahtna* court, this court's review focuses on questions of arbitrability, not on whether the arbitrator construed the

contract in the way that this court would have construed it. *See Butler v. Dunlap*, 931 P.2d 1036, 1039 (Alaska 1997) (noting that "there are no statutory grounds for review of an arbitrator's determination as to the meaning of contract provisions which do not pertain to the issue of arbitrability"); *Ahtna*, 894 P.2d at 661 (stating that "an arbitrator's misconstruction of a contract is not open to judicial review, except on questions of arbitrability").

es that the arbitrator has exceeded his or her authority, we will affirm the arbitrator's conclusion as to the scope of his or her powers if "the arbitrator's conclusion is reasonably possible." [10] An entry of final judgment under Rule 54(b) is reviewed for abuse of discretion.[11]

### 2. Issues on cross-appeal

■ A superior court's decision whether a particular issue is arbitrable—an issue underlying all of the objections raised by Alaska Sales and Service on cross-appeal—is reviewed de novo.[12] A trial court's award of attorney's fees is reviewable for an abuse of discretion.[13] The postjudgment rate of interest is set by statute, and a superior court's application of this statute is a question of law that we review de novo.[14]

### B. Evident Partiality

■ Kinn and Singletary raise two related arguments regarding the alleged partiality of the arbitrator. First, they argue that, under the arbitration provision in the contract, Davis was bound to follow the American Arbitration Association (AAA)/American Bar Association Code of Ethics for Commercial Arbitrators and that these rules required disclosure of Davis's ties with opposing counsel.[15] Second, they argue that Davis showed "evident partiality," listed in AS 09.43.120(a)(2) as a ground for vacating an arbitration result.[16] Both of these arguments turn on whether the relationships that Davis had with counsel for Alaska Sales and Service were the type of relationships that could raise reasonable doubt as to his partiality.

### 1. Is failure to disclose under the AAA Rules an appealable issue?

As Kinn and Singletary point out, the arbitration clause in the property contract specified that the arbitration be "in accordance with the Rules and Procedures of the American Arbitration Association." Canon II of the AAA Code of Ethics for Arbitrators in Commercial Disputes states that "[p]ersons who are requested to serve as arbitrators should, before accepting, disclose ... any

---

10. *Marathon*, 972 P.2d at 600.

11. *Williams v. Mammoth of Alaska, Inc.*, 890 P.2d 581, 586 (Alaska 1995). Kinn and Singleton argue that their fourth issue on appeal, "whether the [s]uperior [c]ourt erred in issuing a[f]inal [j]udgment requiring that future disputes relating to the implementation of certain provisions of the [f]inal [j]udgment be brought before the arbiter," should be subject to a de novo standard of review. The case they cite, *International Brotherhood of Electrical Workers, Local Union 1547 v. City of Ketchikan*, 805 P.2d 340 (Alaska 1991), does not support their argument with regard to the standard of review. Rather, *IBEW* holds that a court asked to clarify an ambiguous arbitration award "should simply determine whether the award is, in fact, ambiguous or unclear [and][i]n cases where real ambiguity exists ... remand those parts of the award that are ambiguous to the arbitrator for clarification." *Id.* at 341.

12. *Ahtna*, 894 P.2d at 660.

13. *Laidlaw Transit, Inc. v. Anchorage Sch. Dist.*, 118 P.3d 1018, 1038 (Alaska 2005).

14. *Marine Solution Servs., Inc. v. Horton*, 70 P.3d 393, 414 (Alaska 2003).

15. Alaska Sales and Service claims that the AAA ethics issue was not raised below, but Kinn and Singletary did raise it before the superior court.

16. Alaska Sales and Service makes a different waiver argument with regard to evident partiality. Pointing out that Davis told both parties in conference that he would not require a deposit of more than a day's fees "because all of them were my friends," Alaska Sales and Service argues that Kinn and Singletary waived any claim of evident partiality by failing to request disclosure immediately. *See Alaska State Hous. Auth. v. Riley Pleas, Inc.*, 586 P.2d 1244, 1248 (Alaska 1978) (holding that a claim of evident partiality had been waived by a party's failure to object after an arbitrator told it "[y]ou guys ... haven't presented your case yet, but ... you guys don't have a chance," and noting that "[a] party may not obtain a second hearing by silently collecting his [or her] objections for the contingency of a loss in the first one"). But an arbitrator's comment that "all of [the attorneys for both sides participating in the conference] were my friends" does not suggest bias toward one party in the manner that "you guys don't have a chance" does. In a small legal community like Anchorage, a long-practicing attorney's statement that every member of a particular group of attorneys is a friend is unremarkable. Because of this context, and because Davis did not differentiate between his friendships with attorneys for the various parties, it is unlikely that the statement would have been sufficient to give notice of the need to object.

**484**

known existing or past financial, business, professional or personal relationships which might reasonably affect impartiality or lack of independence in the eyes of any of the parties."[17] The AAA Commercial Arbitration Rules specify that an arbitrator must "disclose to the AAA any circumstance likely to give rise to justifiable doubt as to the arbitrator's impartiality or independence, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives."[18] The AAA is then responsible for "communicat[ing] the information to the parties and, if it deems it appropriate to do so, to the arbitrator and others."[19] Although Alaska Sales and Service may be correct in arguing that the AAA Code of Ethics, standing alone, does not create grounds for appeal,[20] neither party claims that Davis disclosed his relationship to the AAA. For this reason, if the relationships that Davis failed to disclose were "likely to give rise to justifiable doubt as to [his] im-

partiality,"[21] his failure to disclose would not only have been a violation of the Code of Ethics, but also of the AAA Rules specifically invoked in the arbitration clause. Having raised the issue before the superior court, Kinn and Singletary can therefore raise it here.

### 2. Did Davis's ties with Bankston constitute evident partiality?

▮ Alaska Statute 09.43.120(a)(2), like the federal Uniform Arbitration Act, provides that a court must vacate an arbitration award if there was evident partiality by an arbitrator.[22] In determining whether evident partiality exists, federal courts have applied a similar analysis to the one called for by the AAA Rules.[23] As Justice White's concurrence in *Commonwealth Coatings Corp. v. Continental Casualty Co.* points out, this standard does not treat all connections between an arbitrator and a party as grounds for finding evident partiality.[24] Rather, it

17. CODE OF ETHICS FOR ARBITRATORS IN COMMERCIAL DISPUTES Canon IIA(1) (2004) (Am. Arbitration Ass'n), *available at* http://www.adr.org/sp.asp?id=21958. As Kinn and Singletary point out, the version in effect at the time of the arbitration was substantially similar, requiring disclosure of "any existing or past financial, business, professional, family or social relationships which are likely to affect impartiality or which might reasonably create an appearance of partiality or bias."

18. COMMERCIAL ARBITRATION RULES AND MEDIATION PROCEDURES R. 16(a) (2005) (Am. Arbitration Ass'n), *available at* http://www.adr.org/sp.asp?id=22440#R16. *Cf.* Alaska R. Admin. P. 23(f)(1)-(6) (requiring retired judges who seek appointment pro tempore to disclose prior relationships with the parties in the case, including whether the judge has acted as a private mediator for the parties within the past two years).

19. COMMERCIAL ARBITRATION RULES AND MEDIATION PROCEDURES R. 16(b) (2005) (Am. Arbitration Ass'n), *available at* http://www.adr.org/sp.asp?id=22440#R16.

20. *See ANR Coal Co. v. Cogentrix of N. Carolina, Inc.*, 173 F.3d 493, 497 (4th Cir.1999) ("Even if [the arbitrator] violated Canon II ... the [AAA] Code of Ethics itself forecloses any use of such a violation as a basis for vacatur. The Preamble of the Code specifically states that it does not ... establish new or additional grounds for judicial review of arbitration awards.") (quotation marks omitted).

21. COMMERCIAL ARBITRATION RULES AND MEDIATION PROCEDURES R. 16(a) (2005) (Am. Arbitration Ass'n),

*available at* http://www.adr.org/sp.asp?id=22440#R16.

22. *Compare* AS 09.43.120(a)(2) ("On application of a party, the court shall vacate an award if ... there was evident partiality by an arbitrator appointed as a neutral."), *with* 9 U.S.C. § 10(a)(2) (2002) ("In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration ... where there was evident partiality or corruption in the arbitrators.").

23. *See Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968) (holding that an arbitrator who had sold services to a contractor involved in an arbitration dispute, including rendering services on the projects at issue in the dispute, displayed evident partiality, and noting that the AAA disclosure rule then in effect, which required disclosure of "any circumstances likely to create a presumption of bias," was "highly significant" in determining that evident partiality could support vacatur of an arbitration award. But the Court did not state a definite test for evident partiality.).

24. *Id.* at 150, 89 S.Ct. 337 ("It is often because they are men of affairs, not apart from but of the marketplace, that [arbitrators] are effective in their adjudicatory function."); ("[A]rbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in ad-

focuses on whether the relationship would cause a reasonable person to doubt the impartiality of the arbitrator, particularly on the grounds of "some financial interest or other loyalty owed to one side of the dispute." [25] Federal courts, and state courts interpreting similar provisions, have articulated different versions of this standard, with some courts finding evident partiality where arbitrators fail to disclose relationships that would lead a reasonable person to believe that a conflict *actually* exists,[26] and others finding evident partiality where the information not disclosed by the arbitrator would lead a reasonable person to believe that a conflict *could* exist.[27] Other versions of this standard do not address the distinction between actual and potential conflicts at all.[28] Although we have previously decided an appeal alleging evident partiality, we have not specifically determined which version of the standard to adopt.[29] But we need not do so

here, because the result will the be same under any version of the standard.

■■■ Even if evident partiality is found whenever a reasonable person would have the impression that there *could potentially* be a conflict—a standard coextensive with what AAA Rule 16 requires arbitrators to disclose—the ties between Davis and Bankston do not rise to the level of evident partiality. Kinn and Singletary have made no showing of any financial interest or other loyalty that would predispose Davis to rule in favor of Bankston. Indeed, Kinn's attorney clarified at oral argument that "[w]e are not arguing that [Davis and Bankston] had a financial relationship." Without a showing of financial interest or a similar reason for loyalty to one side, Davis's having represented a different client in the same case as Bankston would be unlikely to constitute evident bias even in a large legal community, and it certainly does not constitute it in a legal community as small as Anchorage.[30] If the opposite

---

vance, or if they are unaware of the facts but the relationship is trivial.").

**25.** *Cellular Radio Corp. v. OKI Am., Inc.*, 664 A.2d 357, 360–61 (D.C.1995); *see id.* at 361 n. 5 (listing cases where courts addressed undisclosed relationships between arbitrators and parties that raised implications of financial interests or other loyalties).

**26.** *See, e.g., Morelite Constr. Corp. (Div. of Morelite Elec. Serv., Inc.) v. New York City Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 84 (2d Cir.1984) ("[W]e hold that 'evident partiality' within the meaning of 9 U.S.C. § 10 will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration."). In cases where an arbitrator is selected because of his or her particular expertise, the *Morelite* court held that even the "appearance of bias" is not necessarily sufficient to disqualify the arbitrator. *Id. Cf. Univ. Commons–Urbana, Ltd. v. Universal Constructors, Inc.*, 304 F.3d 1331, 1340 (11th Cir.2002) ("At first blush, a large number of ... encounters would seem to imply an inappropriately close association between arbitrator and counsel. Closer inspection reveals, however, that frequent interactions between Meyerson and Bradley Arant may simply be the result of the fact that both specialize in construction law in Birmingham, Alabama. Such familiarity due to confluent areas of expertise does not indicate bias.").

**27.** *Cf. Univ. Commons–Urbana, Ltd.*, 304 F.3d at 1339 ("[A]n arbitration award may be vacated due to the 'evident partiality' of an arbitrator only when either (1) an actual conflict exists, or

(2) the arbitrator knows of, but fails to disclose, information which would lead a reasonable person to believe that a potential conflict exists.") (quotation marks omitted); *Nw. Mech., Inc. v. Pub. Util. Comm'n*, 283 N.W.2d 522, 524 (Minn. 1979) (reversing an arbitration award on the grounds that dealings between two of the arbitrators and one of the parties "might create an impression of possible bias").

**28.** *See, e.g., Positive Software Solutions, Inc. v. New Century Mortgage Corp.*, 436 F.3d 495, 502 (5th Cir.2006) (holding that "an arbitrator selected by the parties displays evident partiality by the very failure to disclose facts that might create a reasonable impression of the arbitrator's partiality"); *Schmitz v. Zilveti*, 20 F.3d 1043, 1047 (9th Cir.1994) (holding that, where the arbitrator fails to disclose a relationship with a party, "[s]howing a reasonable impression of partiality is sufficient" to establish evident partiality) (quotation marks omitted).

**29.** *See Riley Pleas, Inc.*, 586 P.2d at 1248–49 (holding that a claim of evident partiality against one arbitrator had been waived by a party's failure to object after an arbitrator told it "[y]ou guys ... haven't presented your case yet, but ... you guys don't have a chance," and rejecting a claim of evident partiality on the part of a second arbitrator where that arbitrator had failed to disclose his one-third interest in a partnership for which one party's attorney had previously performed legal services).

**30.** *Cf. Cellular Radio Corp.*, 664 A.2d 357 (applying New Jersey law to hold that an arbitrator's

were true, the most experienced members of the Anchorage bar would be effectively disqualified from acting as arbitrators, and it would be difficult to find any arbitrator at all for some disputes.[31]

■ Similarly, the occasional referral of cases from Bankston's office to Davis's office, and vice versa, based on the specialties of the attorneys in those offices does not establish that Davis had reason to be partial.[32] Exclusive or frequent referrals, or referrals made for substantial consideration, could raise serious doubts as to an arbitrator's partiality, but the referrals here appear to have been infrequent and nonexclusive.[33] Moreover, Kinn and Singletary do not claim that the

referrals created a financial interest on the part of Davis.

■ Davis's participation in a bar event coordinated by Bankston is equally unpersuasive as evidence of partiality. As other states' courts have noted, participation or leadership in a professional organization's activities does not necessarily create an impression of bias.[34] Nor is participation in that organization's activities or leadership.[35] Furthermore, every practicing lawyer in this community is a member of one of the sponsors of the "Masters in Trial" program—the Alaska Bar Association. A holding that participation with a party's attorney in this organization's activities constituted evident bias would make it difficult for parties in Anchor-

---

previous representation of a client in a case in which one party's lawyer represented a party adverse to the arbitrator's client did not constitute evident partiality). In the present case, the clients represented by Davis and Bankston were not adversaries but, according to Davis, "there were independent interests of [Davis's] client that were separate from the interest[s] of Mr. Bankston's client." At oral argument, Kinn's attorney cited *Milliken Woolens, Inc. v. Weber Knit Sportswear, Inc.*, 11 A.D.2d 166, 202 N.Y.S.2d 431, 435 (N.Y.App.Div.1960) in support of the proposition that an arbitrator's involvement in another case with a party can constitute evident partiality. But *Milliken* is inapposite because the relationship between the arbitrator and the attorney was significantly closer in that case. Unlike the arbitrator and lawyer at issue in *Milliken,* Davis and Bankston were not co-counsel and, unlike the previous case in *Milliken, VECO* was not pending at the time of the arbitration. *Cf. Positive Software Solutions*, 436 F.3d at 497–98, 504 (holding that an arbitrator displayed evident partiality by failing to disclose that he was co-counsel with one of the parties' attorneys in a previous action, even after he was asked about prior professional relationships). Furthermore, unlike in *Milliken,* there is nothing in the record here to "sustain[ ] a conclusion that there was covert influence in the selection of [the] arbitrator[ ]," and there is no allegation that "a substantial claim which respondents' counsel was prosecuting against this arbitrator's company at the time of the arbitration was settled immediately after the award ... was made." *Id.* at 435–36.

**31.** *Cf. Morelite*, 748 F.2d at 83 (noting that "to disqualify any arbitrator who had professional dealings with one of the parties (to say nothing of a social acquaintanceship) would make it impossible, in some circumstances, to find a qualified arbitrator at all"). This would be an even greater problem in other Alaska communities, all of which are smaller than Anchorage.

**32.** *Cf. San Luis Obispo Bay Props., Inc. v. Pac. Gas & Elec. Co.*, 28 Cal.App.3d 556, 568, 104 Cal.Rptr. 733 (Cal.App.1972) ("Here there is no showing that Goode and Shelger did anything more than merely refer their overflow cases to other appraisers—presumably to several others as well, since both men had more business than they could handle. It would perhaps be a different matter if they had referred more cases to each other than to other appraisers, or had regularly given each other the first opportunity at a reference (or the first opportunity at particularly desirable cases), but there is no indication of any favoritism or unusual preference here—nothing, in short, that could be fairly said to create an impression of possible bias as a matter of law.").

**33.** Davis, in his second letter to Reeves, explains the referrals as follows:

I told you ... that over the years Mr. Bankston and I have referred cases to one another on an infrequent basis, and have been opposing counsel as well. I believe I have already told you that I have infrequently referred clients to Mike Mills [ (a member of Bankston's firm) ] on bankruptcy matters. No one, either Mr. Bankston or Mr. Amodio [ (an attorney representing Kinn and Singletary) ], has ever told me the reasons I was recommended by either of them. I have never asked and have simply assumed that my experience in environmental cases might have been a factor that was considered by both of them.

**34.** *San Luis Obispo Bay Props.*, 28 Cal.App.3d at 567, 104 Cal.Rptr. 733.

**35.** *See, e.g., St. Paul Ins. Cos. v. Lusis*, 6 Wash. App. 205, 492 P.2d 575, 581 (1972) (holding that "the arbitrator's failure to disclose either his membership on the Board of Governors or his service with one of respondent's counsel on that board does not constitute sufficient grounds to warrant vacatur of the arbitrator's award").

age to find qualified arbitrators for their disputes and, for those lawyers interested in acting as arbitrators, would severely restrict the available range of professional enrichment activities.

■ Finally, the overall context of Davis's alleged partiality includes not only his relationships with Bankston, but also his relationships with counsel for Kinn and Singletary.[36] Davis appears to have had a professional relationship with the spouse of Amodio, an attorney representing Kinn and Singletary, that was significantly closer than his dealings with Bankston. In contrast to his work representing a co-party in *Veco* and occasional referrals to and from Bankston, Davis maintains in his first letter to Reeves that Amodio's wife "has performed substantial ... legal work for me on and off for close to twenty years," and that his law firm's "billing system has only recently been updated to take [her] name out of it." Davis also noted that he "had referred and/or been referred" by both Bankston and Amodio. The fact that Davis had similar, or even closer, ties with Amodio makes it even less likely that he was partial toward Bankston's client. Because Davis had professional contacts with both sides, none of which could reasonably create an impression of evident partiality, we affirm the superior court's holding on this issue.

## C. Scope of the Arbitrator's Authority

■ Kinn and Singletary argue that the arbitrator exceeded the scope of his authority under AS 09.43.120(a)(3)[37] by rescinding the property contract, but not the asset purchase agreement. But the question whether Kinn and Singletary successfully negotiated for a single contract (as opposed to two separate contracts) is a question of fact, and the determination whether rescission is an appropriate remedy and, if so, how that remedy should be applied, is a question of law. As Alaska Sales and Service correctly points out, we apply an extremely deferential standard of review to the arbitrator's decisions on questions of fact and law: under Alaska's Uniform Arbitration Act, "the arbitrator's findings of fact are unreviewable, even in the case of gross error," and the arbitrator's legal conclusions are equally unreviewable, except where they pertain to arbitrability.[38] Claims that the arbitrator construed the contract in a manner exceeding his or her powers are reviewable, but will only be reversed "if all fair and reasonable minds would agree that the construction of the contract made by the arbitrator(s) was not possible under a fair interpretation of the contract."[39]

Kinn and Singletary point to our holding that "[a] contract is severable ... when it is of such a nature that it is clear that the formation of the contract itself was not dependent on all of its parts together, but rather that it could just as well have been entered into as several different agreements."[40] They also rely on the rule of

36. This is not to suggest that relationships that would constitute evident partiality can be "cancelled out" by ties with the other side that would also indicate bias. All such ties should be disclosed. *See* COMMERCIAL ARBITRATION RULES AND MEDIATION PROCEDURES R. 16(a) (2005) (Am. Arbitration Ass'n), *available at* http://www.adr.org/sp.asp?id=22440# R16. But, where the relationships with neither side rise to the level of evident partiality, the fact that an arbitrator has professional contacts with both sides casts doubt on the view that the arbitrator is biased in favor of one side.

37. *See* AS 09.43.120(a)(3) (providing that a court must vacate an award if "the arbitrators exceeded their powers").

38. *Ahtna*, 894 P.2d at 660–61. A claim involving a garden variety error in contract interpretation, rather than "the arbitrator's construction of the contract *with regard to arbitrability*," is ordinarily not reviewable. *Id.* at 661. (Emphasis added.) Kinn and Singletary, however, assert not only that the arbitrator misinterpreted the contract, but also that he lacked the authority to impose partial rescission. The arbitrator's choice of this remedy necessarily implies a determination that he has the authority to impose such a remedy. The sole focus of our review is that determination, and nothing in this section should be construed as a ruling on the underlying contractual issues, or the general appropriateness of partial rescission as a remedy. *Id.*

39. *Univ. of Alaska v. Modern Constr., Inc.*, 522 P.2d 1132, 1137 (Alaska 1974).

40. *Johnson v. Olympic Liquidating Trust*, 953 P.2d 494, 497 (Alaska 1998). As Alaska Sales and Service notes, however, this court actually allowed partial rescission in *Johnson*. *See id.* at 498 (holding that one party had "no right to

construction that "[w]here two or more contractual documents are executed substantially simultaneously and are clearly interrelated, they must be construed as the whole contract."[41] But whether and how these rules apply to the interpretation of the contract in the present case are questions of law, as is the question of the appropriate remedy. Although this court might reach a different result if it interpreted the contract on the merits, the arbitrator's interpretation is not so obviously wrong that "all fair and reasonable minds"[42] would find it impossible under the terms of the contract. The parties themselves provide strong support for this view: each of their briefs contains a lucid, detailed argument—relying on authority from this and other jurisdictions—that the party's preferred interpretation and remedy are the ones required by Alaska law. Because reasonable minds can differ on whether the arbitrator interpreted the contract(s) in a manner that exceeded his powers, we affirm the superior court's decision on this issue.

### D. Issuance of the Rule 54(b) Judgment

■■■■■■ Kinn and Singletary argue next that the superior court erred in issuing a Rule 54(b) judgment while they were pursuing relief against a third party. Alaska Civil Rule 54(b) carves out an exception to the general rule that appeals "may be taken only after the entire case is disposed of on all substantive issues,"[43] providing that

> [w]hen more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are in-

volved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

Entry of final judgment under Rule 54(b) is "[t]ypically ... appropriate only if the party seeking judgment is likely to suffer actual hardship otherwise."[44]

Although Kinn and Singletary claim that the superior court "did not find that [Alaska Sales and Service] would suffer any hardship if the [c]ourt did not grant the [R]ule 54(b) motion," the court's initial Rule 54(b) order specifically identified the harm of "undue delay in enforcement of arbitration awards."[45] The court also noted that delaying judgment "would be contrary to both the parties' express agreement for arbitration" and, more broadly, that such a delay "could discourage parties from engaging in arbitration and would delay the aggrieved party their rights."

The delay at issue would hinge on the third-party claim brought by Kinn and Singletary against Hagen, for which "[t]rial [was] scheduled to begin in March, 2006." Hagen, in turn, has brought a third-party claim against Cliff Bond, d/b/a M & B Plumbing and Heating, who has brought yet another third-party complaint against David Heusser. If Hagen successfully argues that resolution of his claim depends on resolution of his own third-party claim, and this pattern applies to subsequent third-party claims, judgment could be delayed indefinitely.[46]

avoid the note at least to the extent of [the sums not procured by fraud]," but permitting rescission as to the amounts tainted by fraud).

**41.** *Sea Lion Corp. v. Air Logistics of Alaska*, 787 P.2d 109, 115 (Alaska 1990).

**42.** *Univ. of Alaska v. Modern Constr., Inc.*, 522 P.2d at 1137.

**43.** *Johnson v. State*, 577 P.2d 706, 709 (Alaska 1978).

**44.** *Williams*, 890 P.2d at 586.

**45.** *See id.* at 587 (holding that "the superior court could properly consider the delay resulting from an indefinite stay or continuance in decid-

ing whether to enter a Rule 54(b) judgment"). The court also noted cryptically that the order was being granted "in light of Mr. Kinn's asset transfers in recent years." Whether this alone would constitute an "express determination that there is no just reason for delay" under Rule 54(b) is unclear.

**46.** If Hagen's third-party claim is similar in substance to Kinn and Singletary's third-party claim (i.e., an allegation that the party being sued is the one primarily responsible for the contamination of the property), subsequent third-party claims could continue the chain of lawsuits *ad infinitum*. Judgment in this case would be held hostage until the chain finally reached a party who could not find someone else to sue.

Because the arbitrator resolved the present dispute without resolving the claim against Hagen, and specifically found that the Kinn/Singletary partnership had illegally concealed and contributed to the contamination of the lot, resolution of the claim against Hagen does not appear to be necessary to resolve any of the substantive issues in this case. Thus, the harm that Alaska Sales and Service would experience without a Rule 54(b) order is obvious: Judgment would be unnecessarily delayed, pending the resolution of a third-party claim that has not yet even gone to trial. For this reason, we conclude that the superior court did not abuse its discretion in entering a final judgment under Rule 54(b).

### E. The Superior Court's Remand of Future Disputes to the Arbitrator

 The final argument raised by Kinn and Singletary is that the superior court in its Revised Entry of Final Judgment erred by remanding future disputes regarding the interpretation of the award to the arbitrator. Kinn argues that such a remand is inconsistent with the language of our decision in *International Brotherhood of Electric Workers, Local Union 1547 v. City of Ketchikan*,[47] which emphasized the "fundamental common law principle that once an arbitrator has made and published a final award, the arbi-

trator's authority is exhausted and he or she can proceed no further"[48] and held that "remand [of an arbitrator's award] is appropriate only where the award is patently ambiguous."[49] But many jurisdictions now permit arbitrators to exercise limited, continuing jurisdiction over the issues that they were initially responsible for adjudicating.[50] Indeed, the 2003 edition of the treatise *Elkouri: How Arbitration Works*, which we cited in *IBEW*, states that

> [t]he arbitration process does not automatically end in those cases where a grievance has been sustained and where a remedy has been ordered. Questions over the application of a remedy can arise after an arbitration award has been issued, which is why arbitrators may decide, at their discretion, to retain limited jurisdiction to resolve any such remedial issues.[51]

Thus, our dicta in *IBEW* should not be interpreted to prohibit arbitrators from retaining limited jurisdiction to ensure that their awards are carried out properly.

 Here, the arbitration award provided that "[a]ny further disputes between these parties as to: the terms of rescission, remediation and expenses of remediation on Lot 7 ... calculation of pre-award or post-award interest, future attorney's fees and costs or

---

**47.** 805 P.2d 340 (Alaska 1991).

**48.** *Id.* at 343 n. 7; *but see Symons v. Schuylkill County Vocational Sch.*, 884 A.2d 953, 958 (Pa. Commw.2005) (holding that "the doctrine of *functus officio* [stating that an arbitrator generally cannot retain jurisdiction absent a mistake, omission, or ambiguity in the award] is a common law concept and applies to common law arbitrations," but that it "has no application" under the Uniform Arbitration Act).

**49.** *Id.* at 344; *see also United Steelworkers of Am., Local 12886 v. ICI Am., Inc., Atlas Point Plant*, 545 F.Supp. 152, 154 (D.Del.1982) ("Where the true intent of an arbitrator is apparent, the award should not be resolved by resubmission to the arbitrator."). The *IBEW* court noted the possibility that, even where an issue is ambiguous, "there may be some instances where remand to the arbitrator is not feasible." *IBEW*, 805 P.2d at 344. Because the arbitrator himself offered to resolve any ambiguities in the arbitration award, this does not appear to be an issue here.

**50.** *See, e.g., LLT Intern., Inc. v. MCI Telecomm. Corp.*, 69 F.Supp.2d 510, 515 (S.D.N.Y.1999) (stating that "courts have routinely provided for the remand of arbitration awards for clarification or completion," and listing cases); *Dean Foods Co. v. United Steel Workers of Am.*, 911 F.Supp. 1116, 1127–28 (N.D.Ind.1995) (noting that "[t]here is a wealth of case law, both in this circuit and in others, recognizing the propriety of an arbitrator retaining jurisdiction over the remedy portion of an award," and listing cases); *Engis Corp. v. Engis Ltd.*, 800 F.Supp. 627, 632 (N.D.Ill.1992) (holding that an arbitrator may retain jurisdiction "solely for the purpose of ensuring compliance with his [or her] award").

**51.** ELKOURI & ELKOURI, HOW ARBITRATION WORKS, 333 (Alan Miles Ruben ed., BNA Books 2003); *see id.* at 333 n. 195 (noting that it is now "common for arbitrators to retain jurisdiction so that their awards are properly carried out and disagreements about the award can be resolved" and citing cases). *IBEW* cites the 1985 edition of *How Arbitration Works*. *See IBEW*, 805 P.2d at 343 n. 7.

interpretation of these awards may be submitted to the undersigned [ (Davis) ] for resolution." Far from reopening issues that had already been decided, the arbitrator was simply offering to resolve any ambiguities in the award and ensure the enforcement of the award. This is precisely the type of limited jurisdiction that other courts now permit arbitrators to retain.[52] For this reason, we hold that the superior court did not abuse its discretion in permitting Davis to retain limited continuing jurisdiction.

### F. Alaska Sales and Service's Cross–Appeal

■ On cross-appeal, Alaska Sales and Service argues that the superior court erred by failing to remand four issues to the arbitrator: (1) attorney's fees and costs for the proceedings before the superior court; (2) the postjudgment interest rate; (3) the method of tender of the rescission deed; and (4) the proper form of the rescission deed. Although an arbitrator may retain jurisdiction, such jurisdiction is generally limited to "[q]uestions over the application of a remedy,"[53] the resolution of which is necessary to ensure compliance with the award.[54] A superior court need not remand issues that have already been resolved unambiguously, or that are only tangentially related to the award.[55] For this reason, whether the superior court erred by failing to remand these issues depends on whether remand was necessary to ensure that the award be carried out properly.

#### 1. Attorney's fees and costs

##### a. Whether the arbitration award was ambiguous

■ Alaska Sales and Service first claims that the award of attorney's fees and costs during the confirmation process should have been decided by the arbitrator, noting that the arbitration provision in the contract gives the arbitrator authority to "assess the costs of arbitration, including legal/accountant's fees and costs against the non-prevailing party." The arbitrator exercised his power to "assess the costs for arbitration" under this provision in a detailed, and unambiguous, section of the summary of all awards.

But the award of fees and costs made by the superior court did not involve the costs of arbitration and did not implicate any ambiguous portion of the arbitrator's award. Because it was an award for costs incurred only in proceedings *before the superior court*, after the arbitrator had already issued his opinion, it fell entirely outside the scope of the arbitrator's award. This is explicitly recognized by AS 09.43.140, which provides that "[c]osts of the application [to confirm or modify an arbitration award] and of the proceedings subsequent to the application, and disbursements may be awarded by the court."

##### b. The superior court's decision

■ Alaska Sales and Service further claims that the superior court erred by failing to grant it full attorney's fees and costs when the arbitration clause required the full cost of arbitration to be paid by the non-prevailing party.[56] As noted above, the proceedings in the superior court were separate from the arbitration proceedings. This court held in *Marathon Oil Co. v. ARCO Alaska, Inc.* that where the language of the attorney's fee clause "suggests that the parties were referring only to the arbitration itself when they agreed to each bear their own costs,"[57] the clause does not apply to post-arbitration proceedings. The same conclusion applies to this case, for the applicable clause in the arbitration agreement states that "the arbitrator shall assess the costs of arbitration, including legal/accountant's fees

---

**52.** *See* ELKOURI & ELKOURI: HOW ARBITRATION WORKS, 333 n. 195.

**53.** *Id.* at 333.

**54.** *See, e.g., Engis,* 800 F.Supp. at 632 (holding that an arbitrator may retain jurisdiction "solely for the purpose of ensuring compliance with his [or her] award").

**55.** *See id.*

**56.** The superior court awarded Alaska Sales and Service twenty percent of its actual expenditures on attorney's fees in accordance with Civil Rule 82(b)(2).

**57.** 972 P.2d at 604.

and costs against the non-prevailing party." The parties argue extensively about whether the superior court should have followed Alaska Civil Rule 82 in awarding fees, but AS 09.43.140 gives the superior court broad discretion to award, or decline to award, fees in confirmation proceedings. Granting post-arbitration attorney's fees in accordance with Civil Rule 82 was appropriate,[58] and for this reason, we affirm the award of attorney's fees.

### 2. Postjudgment interest

██ Alaska Sales and Service next argues that the superior court erred in following the arbitrator's decision to award postjudgment interest at 3.75% per annum because "[t]he arbiter did not establish a post[ ]judgment interest rate or indicate whether the post-award rate should apply if the award was reduced to judgment." But, as Kinn and Singletary correctly note, the arbitrator's award of 3.75% interest until all amounts were paid effectively established this as the postjudgment interest rate. The superior court's award of 3.75% postjudgment interest—relative to the arbitrator's judgment, not its own[59]—was therefore nothing more than a confirmation of this portion of the arbitrator's decision. Because Alaska Sales and Service has not established that there was any ambiguity in the arbitrator's decision, or that remand is necessary to properly enforce the award, we hold that the superior court did not err in adhering to the arbitrator's postjudgment interest rate.

### 3. Method of tendering the rescission deed

██ Alaska Sales and Service alleges that the portion of the arbitrator's award specifying how the deed of rescission is to be tendered was ambiguous, and that the superior court erred by choosing a particular method of tender. The superior court's revised final judgment states that "once [d]efendants, or any individual or combination of [d]efendants, have partially satisfied this judgment by paying [the purchase price minus accrued rents], Alaska Sales shall execute a warranty deed conveying title to the defendant or defendants who paid this judgment for the two parcels of real property."

The relevant portion of Davis's decision stated that "[t]he property must be deeded back to [Kinn and Singletary] by warranty deed," and ordered Kinn and Singletary to "repay the plaintiffs the purchase price of the property."[60] In the summary of all awards, the arbitrator commented in a footnote that, "until there is a closing for the return of the property, and the amounts awarded to [Alaska Sales and Service] are paid, interest will continue to accrue at the rates I awarded."[61] Alaska Sales and Service claims that this is ambiguous because it does not indicate whether the entire award must be paid at the time of the closing, or just the purchase price of the property. But this footnote actually draws a distinction between the "closing" and the payment of interest on remaining unpaid sums. For this reason, the language of the arbitration award was not ambiguous, and remand is not necessary for the proper en-

---

**58.** *See Integrated Res. Equity Corp. v. Fairbanks N. Star Borough,* 799 P.2d 295, 300 (Alaska 1990) (distinguishing between fees incurred in the course of the arbitration, to which Civil Rule 82 does not apply, and fees incurred in post-arbitration proceedings, to which Civil Rule 82 can apply).

**59.** Had the postjudgment interest been relative to the court's own judgment, the court would have been bound by AS 09.30.070(a), which provides in relevant part that "the rate of interest on judgments and decrees for the payment of money ... is three percentage points above the 12th Federal Reserve District discount rate in effect on January 2 of the year in which the judgment or decree is entered."

**60.** The arbitrator's award repeats this, requiring tender of the warranty deed and repayment of the purchase price, but not stating whether tender of the warranty deed is triggered by partial payment of the purchase price, full payment of the purchase price but partial payment of the entire award, or full payment of the entire award.

**61.** The footnote is appended to a sentence discussing interest on the amount awarded for environmental damages, a component of the award separate from repayment of the purchase price of the property.

**492**

forcement of the award.[62] Since the superior court's order does not differ materially from the arbitrator's order with regard to the method of tender, we affirm the judgment of the superior court on this issue.

### 4. Form of the rescission deed

 Finally, Alaska Sales and Service claims that the definition of the term "property" that the arbitrator directed the parties to use in the rescission deed is ambiguous and should be remanded to the arbitrator. Specifically, the definition of "property" used in the original property contract, and used by the superior court, includes "all of the improvements, structures, fixtures, facilities, installations and equipment in, on[,] over or under the [l]and." Although Alaska Sales and Service claims that this creates tension with the arbitrator's award, the arbitrator's discussion of this issue is perfectly consistent with both the contract and the superior court's revised final judgment:

> VMI requests that the definition of the "property" to be returned to it in rescission include the fixtures. "Property," as that word is used in Paragraph 45 of the award[,] is defined as it is in the Contract for Sale of Real Property. However, personalty attached to the property sold separately by Mr. Kinn, Mr. Singletary or VMI to [Alaska Sales and Service] from the sale of the real estate would not, of course, be part of the rescission; unless the consideration paid by [Alaska Sales and Service] for these items was returned as well.

The arbitrator simply held that a particular category of personal property—items unrelated to the underlying real property[63] that had been treated separately in the first transaction—would be treated the same way in the rescission deed. The enforcement of this portion of the award does not require a remand to the arbitrator, as no ambiguity is evident on the face of the statement, and the superior court's use of the original contract

language does not conflict with the arbitrator's legal conclusion regarding the appropriate award. For this reason, we affirm this portion of the superior court's decision.

## IV. CONCLUSION

For the reasons set forth above, we AFFIRM the judgment of the superior court.

---

**62.** *See Engis,* 800 F.Supp. at 632 (noting that an arbitrator's continuing jurisdiction exists "solely for the purpose of ensuring compliance with his [or her] award").

**63.** *See K & L Distribs., Inc. v. Kelly Elec., Inc.,* 908 P.2d 429, 432 (Alaska 1995) (noting the

VCC's distinction between personal property unrelated to real estate and "fixtures," which are "items of personal property that become so affixed or otherwise so related to real estate that they become part of the real estate") (quotation marks omitted).